The ATTORNEY GENERAL of the State of New-Jersey, at the relation of DANIEL PETTEE and JOSHUA SMITH, v. JOHN A. STEVENS, EDWIN A. STEVENS, and JEREMIAH H. SLOAN.

Where a corporation has been duly organized, and thereby acquired a legal existence, a court of equity will not, upon an alleged *nonuser* or *misuser* of its corporate privileges, declare the charter to be forfeited: such a power is of right to be exercised by a court of law and not a court of chancery.

Where a set of men claiming to be a legally incorporated company under an act of the legislature, have done every thing necessary to constitute them a corporation, colourably at least, if not legally, and are exercising all the powers and functions of a corporation; they are a corporation, *de facto*, if not *de jure;* and this court will not interfere, in an incidental way, to declare all their proceedings void, and treat them as a body having no rights or powers.

The commissioners appointed to receive subscriptions for the stock of an incorporation, are trustees; and as such this court, if a proper case was made, might control their acts: but, to authorize it, there should be some complaint on the part of the stockholders, or persons subscribing or seeking to subscribe for stock; and the proceeding should be by bill, and not by information.

The right to the use of a navigable stream is a right common to all the people of this state. Before the revolution, this right was in the crown: the people are now the sovereign power, and this right is vested in them. It is their property, and, as such, may be disposed of for the common benefit, in such way as they may see fit. This disposition can only be made by the legislature of the state, which is the rightful representative of the people: and where such disposition is made, " consistently with the principles of the law of nature, and the constitution of a well-ordered society," it must be considered valid.

The power of the legislature is not omnipotent; it has boundaries beyond which it may not pass. It cannot authorize private property to be taken for public use, without providing for a just remuneration; and in regard to those public rights which appertain to the citizens generally, a common property, it cannot make such disposition of them as entirely to defeat the citizens of their common rights.

This power is not confined to cases only, where no possible injury would accrue to any individual. In every case, some inconvenience must accrue to individuals, or some privileges be measurably impaired: yet if such disposition or regulation (of the common right) be for the common benefit; if the situation of society and the wants of the public require it, individual convenience must yield, and that upon the most obvious principles of the social compact.

47

July, 1831.

The Attorney
General
v.
Stevens et al.

The surveyors of the highways and chosen freeholders are vested with a general authority, by statute, to lay out and cause to be opened public highways: but this general power must be construed reasonably. "A navigable river is of common right a public highway; and a general authority to lay out a new highway, must not be so extended as to give a power to obstruct an open highway already in the use of the public." Hence it has always been considered necessary, when a bridge was required over a navigable stream, to procure a special act of the legislature : their right to grant such power is beyond dispute.

There is not, in the charter of the Camden and Amboy Railroad and Transportation company, any specific grant of power for this particular bridge, (over South river.) But there is a special authority to erect bridges and all other works necessary for the completion of this particular road. The conclusion is, that the power to construct bridges over all the streams on the route, so as best to carry into effect the object of the incorporation, is given in the act, if not in express terms, yet by necessary implication ; and the grant thus made is constitutional.

The power must, nevertheless, be exercised discreetly, and with a due regard to the privileges of others. If any injurious and wanton exercise of it be shown to this court, it will interfere and regulate it on proper principles. To warrant such interference, the exercise of the power must be shown to be, not only injurious, but wilfully or wantonly so : a mere mistake in judgment will not be sufficient.

The word *survey*, does not necessarily, *ex vi termini*, mean a *map* or profile : they are sometimes used as convertible terms, not always. The books filed by the Camden and Amboy Railroad and Transportation company, in the office of the secretary of state, containing a description (in words and figures) of the commencement of the road, the different stations made at the time of the survey, the courses and distances between those stations, and the number of stations, to the termination of the road, is "*a survey*" within the meaning of that provision of the charter which requires, that "a survey of such route and location (of the road) shall be deposited in the office of the secretary of state ;" at least so far forth as to warrant the court in refusing an injunction on the ground that no survey whatever has been made. Injunction refused.

In this case an information was filed in the name of the Attorney General, (at the relation of Daniel Pettee and Joshua Smith,) against the defendants, to restrain the Camden and Amboy Railroad and Transportation company, and the defendants acting under their authority, from erecting a bridge, on the route of said road, over South river, a navigable stream in the county of Middlesex. The grounds charged in the information, and relied on in the argument, were ; 1. That the stock of the company was not legally subscribed according to the terms of the charter ;

the commissioners, by their secretary, having subscribed for the whole of the stock, in the names of themselves and their friends, upon the first opening of the books ; and immediately thereafter closed the books, and refused to permit other persons to subscribe who were present and desired to subscribe at the time, and also refused to open the books and permit others to subscribe on subsequent days, and at other places, when and where they had given notice that the books would be opened to receive subscriptions ; in consequence of which, it was insisted that the subsequent organization of the company, by choosing directors, and their proceedings, was void ; and that the company, not having been duly organized, had no legal existence, and were not authorized to act as a corporation. 2. That the company had no express authority given them by the charter, to erect bridges over navigable streams ; and if such a power was given, the grant was unconstitutional and void : And, 3. That a survey of the route and location of the railroad had not been made and deposited in the office of the secretary of state, pursuant to the direction of the charter : that the making and filing of the survey in the secretary's office was a condition precedent, without the performance of which the proceedings of the company were void.

The defendants put in their answer, and depositions and proofs were taken and read on the motion for the injunction. The facts appear more fully in the opinion of the court.

*W. Halsted,* for the relators. 1. South river is a navigable stream and public highway. This has been recognized by the legislature, in the act of 1816, incorporating the Bordentown and South Amboy Turnpike company, and the acts of 1817 and 1819, authorizing them to build bridges over Crosswicks creek and South river. The highest authority on this subject is to be found in *Leam. and Spi. N. J. L.* 390. All streams are considered navigable where the tide ebbs and flows : 1 *Halst. R.* 75. In South river the water rises from three and a half to six feet. The stream may be navigated with sloops of from twenty to thirty tons burthen. It is not material that the old channel has filled up ; there is a new and better one opened : *Ang. on W. C.* 96. The right of navigation is protected by the act of 1755.

July, 1831.

The Attorney General
v.
Stevens et al.

This cannot be repealed by implication. The right may be regulated, but not impaired : 1 *Halst. R.* 75. Every obstruction to a navigable stream is a public nuisance : *Eden on Inj.* 161 ; *Jacob L. D. Nuisance;* 5 *Bac. Ab. Nuisance, A. ;* 19 *Vin. Ab.* 244 ; *Noy.* 103. This court will interfere in a plain case of nuisance : *Eden on Inj.* 157, 162 ; 2 *Ans. R.* 603 ; 3 *Atk. R.* 21, 750 ; 5 *Ves. jr.* 29 ; *Amb. R.* 158 ; 2 *Cox R.* 87. Every navigable stream is a public highway : *Ang. W. C.* 17 ; *Camp. N. P.* 517 ; 4 *Vin. Ab.* 503 ; 19 *Vin. Ab.* 244.

If South river be a navigable stream and public highway, the power to lay out a new highway must be so construed as not to interfere with it. To authorize such interference, there must be some specific provision in the charter : 2 *Mass. R.* 489 ; 10 *Mass. R.* 70 ; 1 *Pick. R.* 180. There must be express authority to take away private rights : 4 *Mass. R.* 125. The powers given to the Camden and South Amboy Railroad company, in their charter, are general ; there is no express authority to erect bridges over navigable streams.

2. Another question arises, whether this company ever had legal existence, or authority to act as a corporation ? It is not a question of *misuser, nonuser,* or forfeiture, that could not be tried in a court of equity ; 19 *John. R. ;* but the question is, whether they have any corporate rights : 4 *Wheat. R.* 691. The charter of the company is not a close charter. They are not incorporated by the act. The franchise is in abeyance ; the corporate powers do not attach until certain conditions are performed. Commissioners are appointed, who upon giving thirty days' notice of the times and places, were to open books to receive subscriptions for the stock, and upon a certain amount of stock being subscribed, the company was to be organized, when the subscribers become the corporation. Has this been legally done ? Notice was given that books would be opened on three successive days, at different places. By the charter every citizen that chose had a right to subscribe ; but the commissioners, contrary to their duty, disposed of the stock before opening the books ; and when they were opened, by their secretary, subscribed for the whole, in the names of themselves and their friends ; then closed the books and refused to permit others to subscribe, who attended and offered to subscribe.

*Jobs* offered to subscribe at Hightstown, and *Black* the next day at Mount Holly, and tendered the first instalment ; but they were refused the privilege. This is a fraud on the law. The stock has never been legally subscribed, and the subsequent organization of the company is void. The commissioners are trustees, and if they have violated their trust, or acted fraudulently, this court will interfere : 1 *Hopk. R.* 587.

Again : This company, before they proceed to form their road, are expressly required to file in the secretary's office, ·"a *survey* of the route and location of the road." This has not been done. They have filed a *book*, containing field notes of stations, of courses and distances, in words and figures ; and even these almost unintelligible, with many erasures and corrections, not noticed in the certificate annexed, so as to operate as a check against future alterations ; without any map or representation of streams, monuments or objects on the route. This does not satisfy the law. A "survey," means a map or profile, exhibiting a view of the route of the road, with reference to natural or artificial monuments or objects, by which it might be traced, and ought to be as perfect and free from erasures and interlineations as a deed, because under this the company acquire title to the lands. Yet even the witnesses differ in opinion, whether this is a survey or not. It is of no use for any practical purpose, and certainly cannot be such a survey as the charter contemplated ; without which the company have no authority to proceed in forming the road or erecting the bridge.

*G. Wood*, for the defendants. The grounds of relief charged in the complainants' bill are not sustained. They say, the commissioners subscribed for the whole stock. They undoubtedly had a right to subscribe for any amount of stock they pleased. By the evidence it appears, that *Jobs* waited until all the stock was taken before he offered to subscribe, and that *Black* was told all the stock was subscribed, after which he made no farther offer. It is said the books ought to have been kept open three days, according to the notice. This was not necessary. The commissioners were not bound to receive subscriptions for more stock than there was to be taken. The case in *Hop. R.* does not

July, 1831.
_____
The Attorney
General
v.
Stevens et al.

support the position : it only proves, that when an excess of stock is subscribed, the court may interfere to regulate its distribution. Suppose this proceeding of the commissioners irregular, who has a right to complain? Certainly none but the parties injured; those who offered to subscribe and were refused. *Jobs* and *Black* make no complaint here : they waive, then, their right; and surely Smith and Pettee, who never offered to subscribe, cannot bring this matter before the court, in an incidental way, after the stock is all subscribed, and the company organized and going on with their work. But if Smith and Pettee can come in, and the manner in which the stock was subscribed is an objection, it does not present the case of a void corporation, or one not organized. The stock has all been subscribed, and the company organized, colourably at least. They are a corporation, de facto, and entitled to go on, and act, until their rights are taken away, which can only be done by a regular proceeding in a court of law. A court of equity will not undertake to treat such a corporation as a void corporation.

But it is the attorney general who complains ; he is the officer of the government; they have waived all objection. The legislature have passed two acts, recognizing the validity of these proceedings ; by one they have agreed to take a larger portion of the stock, and by the other have married this corporation to the Delaware and Raritan Canal company.

As to the survey of the route ; the word *survey*, here, means such a description of the route, as that it may be ascertained and traced, should occasion require. This is best given in words or figures, expressing the number of stations, and the several courses and distances, from the beginning to the end of the route. Without this a map or profile would afford no aid. A survey of lands, under the proprietors of New-Jersey, does not mean a map, but a description in words, to be recorded in a book. Yet, if the survey be defective, a court of equity will not, on that ground, interfere to arrest the proceedings of the corporation.

The remaining ground is, the obstruction to the navigation of the river. The right of location is in the directors; they may pass over all lands and waters that may be necessary, and erect bridges. This power is not restricted, like that of the board of

freeholders, to the erection of bridges over streams not navigable. The charter authorizes the making of the road, which cannot be done without passing over navigable streams ; and the power to erect bridges over them, is conferred by the nature of the grant, to be exercised, it is true, with all due regard to the rights of others.   If this stream was navigated by *sloops*, it would be proper to put a draw in the bridge.   But it appearing from the evidence that it is only navigated by *scows*, that is unnecessary ; and especially as there is now a permanent bridge over the same stream, on the route of the turnpike, but a few rods below.   The power thus granted is not unconstitutional.   The right is in the legislature ; it is an incident of sovereignty, not divested by the state or federal constitutions.   You cannot, it is true, take private rights for public use without just compensation.   It is otherwise with a right of way, or navigation, which is public property : 2 *Peters'* *U. S. C. R.* 412, 414.   Having the power, the company are exercising it discreetly.   It is said, they might have crossed the river higher up ; but it appears this route is the shortest and best. This court will not control the directors in the exercise of their discretion, unless it is wantonly used : 1 *John. C. R.* 18.   What is the injury apprehended ?   The navigation will not be destroyed, but subjected to some little inconvenience.   This is the case with the bridge over the Raritan at New-Brunswick, and bridges over every navigable stream.   Yet the power to authorize their erection cannot be questioned.

THE CHANCELLOR.   This is an information filed by Daniel Pettee and Joshua Smith, in the name of the Attorney General of the state, for the purpose of obtaining an injunction to restrain and prevent the defendants, who profess to act under the authority of the Camden and Amboy Railroad and Transportation company, and also to restrain the said company, from erecting a certain bridge over South river, in the county of Middlesex.   It is alleged, that South river is a navigable stream ; the tide ebbing and flowing at the place where the bridge is sought to be erected : that it is, of course, a public highway, and not subject to hindrance or interruption by the said company, or any persons pretending to act under their authority.   The mode of proceeding adopted in

*July, 1831.*

The Attorney General
v.
Stevens et al.

this case, is founded on the idea, that the erection of a bridge across this navigable stream would be a public nuisance, and that at the instance or information of the proper law officer of the state, this court may interfere to prevent the erection of the nuisance by injunction.

The relief is prayed for on two grounds :

The first is, that the Camden and Amboy Railroad and Transportation company, under whose authority the defendants claim to act, has no legal existence, inasmuch as the terms of the act of incorporation have not been complied with, and consequently that the proceedings of the company are void.

The second is, that no express authority is given by the charter to the company, to construct bridges over navigable streams of water, and that such a power cannot be exercised upon implication merely ; and moreover, that if such power be given, the grant, as to that, is unconstitutional and void.

Upon the first point, the material charges in the information are these : that sometime after the passing of the act of incorporation, the commissioners named in the act caused public notice to be given, that books of subscription to the capital stock of the company, would be opened at the house of David Perrine, in Hightstown, on Tuesday the 30th day of March ; at the house of Griffith Owen, in Mount Holly, on Wednesday the 31st day of March ; and at the house of Isaiah Toy, in Camden, on Thursday the 1st day of April : that the books would be opened at ten o'clock each day, and that five dollars on each share subscribed should be paid at the time of subscribing. That the stock was in great demand, and many persons attended at Hightstown for the purpose of subscribing for stock ; but that the commissioners subscribed for the whole of the capital stock themselves, either in their own names or the names of a few of their friends ; and immediately after the said commissioners had thus subscribed, they closed the subscription books, and informed the persons who applied to them for stock in the said company, that the stock was all subscribed and the subscription books closed, and refused to permit them to subscribe. That the next day, many persons attended at Mount Holly, and applied to the commissioners for leave to subscribe, but the commissioners refused ;

and particularly one John Black offered to subscribe, and tendered in specie the first instalment upon the shares he asked leave to subscribe for; that the said commissioners refused leave to the said John Black to subscribe for any of the said stock, but offered to sell him stock for an advance upon the par value, which Black refused to give. That notwithstanding the illegal manner in which the said stock was subscribed, the commissioners have undertaken to organize the said company according to the provisions of the said act of incorporation.

All the facts charged have not been fully sustained; but it sufficiently appears from the answer and depositions filed, that the stock was all subscribed and taken, on the first day, at Hightstown : that while there, no person wrote in the book of subscription but the secretary of the commissioners. It was evidently understood by the commissioners, who were to be permitted to subscribe and receive stock ; for when the secretary had made an end of subscribing for himself, and the other commissioners, and those whose names were given by them or some of them, it turned out that the precise amount was taken, neither a share more nor a share less ; whereupon the books were closed, and no person after that was permitted to subscribe.

It has been held, that where a corporation has been duly organized, and thereby acquired a legal existence, a court of equity will not, upon an alleged nonuser or misuser of its corporate privileges, declare the corporation to be forfeited ; that such power is of right to be exercised by a court of law, and not a court of chancery. And although this doctrine, as laid down in *Slee* v. *Bloom,* 5 *John. C. R.* 366, was subsequently overruled by the court of errors in the state of New-York, yet it has been recognized in at least two several instances in this court, and appears to me to be the safe rule for a court of equity. The information in this case seeks to avoid that principle. It does not bring the company into court and proceed against them as duly incorporated, but it proceeds against certain individuals, and sets up that the Camden and Amboy Railroad and Transportation company, under which those individuals claim to act, has not, and never had legal existence ; that the stock was never subscribed for according to law, and that all subsequent proceedings are void.

48

The object appears to be, to bring before the court the question whether the commissioners, who were appointed in this case by the legislature to receive subscriptions, and to do those preliminary acts which are necessary for the proper organization of the company, acted in compliance with the law and in good faith. As to their power and authority, derived as it was from the legislature, its legality has not been questioned.

It is proper to inquire in this place, how far this court will undertake to look into these matters, thus incidentally brought before them, and decide upon their illegality or irregularity. This information is filed by the Attorney General, for the purpose of restraining certain persons from erecting a bridge over South river, on the ground that it is a public highway, and that the erection of a bridge over it would be a nuisance. These persons are acting under the authority of a corporation, organized under colour of law. The court is asked to infer, from the facts shown, that there is no legal corporation in existence.

I am not satisfied under existing circumstances, and with the facts before me disclosed by the information itself, that it is the province of this court to interfere in the manner desired. It appears by the information, that the shares of the company have been all subscribed in the manner therein stated ; that upon due notice given, the stockholders have appointed their directors ; that a survey of the proposed road has been made by the company, and that the erection of the road is in progress. Here, then, is a set of men claiming to be a legally incorporated company under the act of the legislature, exercising all the powers and functions of a corporation. They are a corporation *de facto*, if not *de jure*. Every thing necessary to constitute them a corporation has been done, colourably at least, if not legally ; and I do not feel at liberty, in this incidental way, to declare all their proceedings void, and treat them as a body having no rights or powers. It has been seen that the court will not do this where a corporation properly organized has plainly forfeited its privileges ; and there is but little difference in principle between the two cases. In both the corporation is actually in existence, but whether legally and rightfully so is the question. And it appears to me, that if the court can take cognizance of the matter in this

case, it must in all others where it can be brought up, not only directly but incidentally.

The case of *Meads* v. *Walker*, *Hopk. R.* 587, relied on in support of the information, is very different from the present. An act had been passed by the legislature of New-York, to incorporate the President, Directors and Company of the Commercial Bank of Albany; and the question was as to the conduct of the commissioners in apportioning the stock among the subscribers. The bill was filed by some persons who had subscribed for stock, but received none; and it was filed against the commissioners, and before any election was had for directors of the company. The proceedings were in *esse* and unfinished; the company was not organized, and had no existence either in law or fact. In that case the court granted an injunction to prevent the election of directors, until a more just apportionment should be made of the stock subscribed. A similar case is to be found in 1 *John. C. R.* 18, impeaching the conduct of the commissioners under the act for the incorporation of the Catskill bank. An injunction was granted on a bill filed before the election of directors.

The persons aggrieved, if there are any such, have made no complaint before this court. They are not here, seeking to have the alleged fraudulent acts of the commissioners set aside, and their own rights declared and protected. If they had presented themselves here at a proper time, or were now here, the question sought to be raised by this proceeding might with some propriety be considered. It is admitted, as contended for on the part of the information, that the commissioners were trustees, and that as such this court, if a proper case were made, might control their acts; but to authorize it, there should be some complaint on the part of the stockholders, or persons subscribing or seeking to subscribe for stock; and the proceeding should be by bill, and not by information. This information, although against individuals named, is in effect against the Railroad company, charging them with an illegal exercise, if not an usurpation of power. Under this view of the case, I deem it unnecessary for me to inquire, whether the conduct of the commissioners was regular and lawful, or otherwise, in permitting the subscriptions to be made in the manner they were, and in neglecting to open the books at all

July, 1831.

The Attorney General
v.
Stevens et al.

the places mentioned in the notiee. The corporation is now organized, and if acting without authority, is liable to be brought at any time before a competent tribunal, in a mode, the legality of which cannot, as I apprehend, be questioned.

The second ground for relief is, that the company have no express authority given them to erect bridges over navigable streams ; and that if such power be given, the grant of it is unconstitutional and void. In either case, it is contended, an injunction should issue.

If a grant of that kind be unconstitutional and void, it will not be necessary to examine whether it has been made or not. Is it, then, unconstitutional ?

South river, at the place where it is contemplated to erect a bridge, is a navigable stream. The tide ebbs and flows, as it is proved, from three and a half to six feet, and the stream is navigated by boats or scows. There is one landing place above the proposed scite of the bridge, and some trade is carried on to that landing. The right to the use of this navigable stream is a right common to all the people of the state. Before the revolution, the right was in the crown. The people are now the sovereign power, and the right is vested in them. It is their property, and as such may be disposed of for the common benefit, in such way as they may see fit. This disposition can only be made by the legislature of the state, which is the rightful representative of the people. And when such disposition is made, " consistently with the principles of the law of nature, and the constitution of a well ordered society," it must be considered valid. Such, as I conceive, has ever been the sound construction of the legislative power, and its exercise has been in perfect accordance with it.

The power of the legislature is not omnipotent. It has boundaries beyond which it may not pass. It cannot authorize private property to be taken for public purposes, without providing for a just remuneration. And in regard to many public rights which appertain to the citizens generally, it cannot make such a disposition of them as entirely to divest the citizens of their common property. But it does not follow from this, that the legislature has power to dispose of those common rights, only in cases where by such disposition no possible injury

would accrue to any individual. Such a power would be nuga- <span style="float:right">July, 1831.</span>
tory. There is scarcely a supposable case in which it could be
exercised. In every case some inconvenience must accrue to
individuals, or some privilege be measurably impaired. Yet if
the disposition or regulation be for the common benefit; if the
situation of society and the wants of the public require it, indi-
vidual convenience must yield, and that upon the most obvious
principles of the social compact.

The relators are owners of property, and interested in the
landing above the scite of the bridge. They have, unquestion-
ably, a common right to the navigation of the stream, and they
now navigate it with scows. A bridge placed across the stream
below the landing, must necessarily affect the navigation in a
greater or less degree, but it would not destroy it. It would oc-
casion some additional trouble and expense, or some additional
delay and risk; but the right, though somewhat impaired, would
still remain. Such is the case in all similar instances, where
bridges are authorized over navigable streams—such as the Pas-
saic, the Hackensack, the Raritan, the Rancocus, and others.

The right of the legislature to make the grant, is beyond dis-
pute. It remains to be considered, whether the power to erect a
bridge over this navigable stream is conferred by the charter.

There is certainly no power given, in express terms, to place
a bridge over *South river*, or any other of the navigable streams
on the route of the road.

The eleventh section of the act, invests the company with full
power to survey, lay out and construct, a railroad or roads, with
all necessary appendages, from the Delaware river, at some point
or points between Cooper's creek and Newton creek, in the coun-
ty of Gloucester, to a similar point or points upon the Raritan
bay. And it enacts, that when the route and location of such
road shall be determined upon, and a survey of such route and
location deposited in the office of the secretary of state, then it
shall be lawful for the company to enter upon, to take posses-
sion of, hold, use, occupy and excavate, any such lands, and to
erect embankments, bridges, and all other works necessary to lay
rails thereon, and to do all other things which shall be suitable
and necessary for the effectual completion of the said road or

The Attorney
General
v.
Stevens et al.

roads, and to carry into full effect the objects of their incorpora-
tion.

This section gives the power to erect bridges generally, where
they may be necessary. It makes no distinction between bridges
over navigable streams, and streams not navigable; and unless
it can be clearly shown that the grant of a power to erect a bridge
over a navigable stream, is to be in some certain and specific form,
I should incline to think it given by this section. It was argued,
and with great force, at the bar, that this general authority, as
it was termed, to erect bridges, did not include the power to place
a bridge over a navigable stream or public highway; and the
case of the *Commonwealth* v. *Coombs*, 2 *Mass. Rep.* 489, was
relied on in support of the doctrine. The law of that case is
sound, but it has no application to the one now before the court.
A certiorari had been sued out, to remove a record of the court of
sessions, respecting the laying out of an highway. C. J. Parsons,
in delivering the opinion of the court, says, " The statute gives
a general authority to the sessions to lay out highways, but the
statute must have a reasonable construction. The authority,
therefore, cannot be extended to the laying out of an highway
over a navigable river, whether the water be fresh or salt, so that
the river may be obstructed by a bridge. A navigable river is of
common right a public highway; and a general authority to lay
out a new highway, must not be so extended as to give a power
to obstruct an open highway already in the use of the public."
The same doctrine is applicable to our surveyors of highways or
chosen freeholders. They are vested with a general authority
by the statute, to lay out and cause to be opened public highways;
but this general power is to be construed reasonably, and with
reference to the rights of others. Hence it has always been con-
sidered necessary, when a bridge was necessary over a navigable
stream, to procure a special act of the legislature. But the power
given to the company in this case, is very different from that vest-
ed in the surveyors of the highways under the general road act.
It is a special power, for certain and specified purposes; not a
general authority growing out of a public statute, and to be exer-
cised or not, as occasion may require. There is not, it is true,
any specific grant of power to construct this particular bridge;

July, 1831.

The Attorney
General
v.
Stevens et al.

but there is a special authority to erect bridges and all other works necessary for the completion of this particular road. If this were not so; if the privilege of erecting bridges over the navigable streams on the route, depended on some subsequent grant of the legislature, the operations of the company would be liable to be arrested at any moment, and the franchise would, of course, be incomplete and comparatively useless.

Again ; the power appears to flow legitimately and conclusively out of the very nature of the grant. The road is to commence below the mouth of Cooper's creek, and between it and Newton creek, and terminate upon the Raritan bay. In taking this route, it is necessary to cross several navigable streams. Cooper's creek cannot possibly be avoided, without great and unreasonable circuity. The same is true in regard to Pennshawkin, Crosswicks, and Rancocus ; and this being the case, and at the same time a matter of notoriety, can it be supposed that the legislature intended to say to the company, you may build your railroad from place to place, at a great expense, but you shall not be permitted to connect the different parts of it by necessary bridges over the navigable streams, without further power from us, to be granted at some future day, at our pleasure? Is it not more reasonable to conclude, that when the legislature gave the authority to erect such bridges and other works as might be necessary for the completion of their road, they intended to convey the right of constructing all bridges on the route of their road, as well those that crossed navigable streams as those that did not? Nay, is not such conclusion necessary for the safety of the company?

The rule, as contended for at the bar, that there ought to be express words to take away vested privileges, is too narrow. In the case referred to, *Coolidge* v. *Williams*, 4 *Mass. R.* 145, C. J. Parsons gives the true principle : " Private statutes, made for the accommodation of particular citizens or corporations, ought not to be construed to affect the rights and privileges of others, unless such construction results from express words, *or from necessary implication.*" In that case, he said, a reasonable effect could be given to every part of the statute without such construction. In this, I do not see how it is possi-

ble to give a reasonable effect to the charter, without giving the power contended for. Any other would leave the company at the mercy of future legislatures, and in a situation of great uncertainty.

The result is, that this power to construct bridges over all the streams on the route, so as best to carry into effect the object of the corporation, is given by the act; if not in express terms, yet by necessary implication; and that the grant thus made is constitutional.

The power must, nevertheless, be exercised discreetly, and with a due regard to the privileges of others. If an injurious and wanton exercise of it be shown to the court, it will interfere and regulate it upon proper principles. To warrant such interference, the exercise of power must be shown to be not only injurious, but wilfully or wantonly so. A mere mistake in judgment will not be sufficient: *Haight and al.* v. *Day and al.*, 1 *John. C.* 18. That must be remedied at law. In this case I do not find any thing like a wanton exercise of power. The company propose to build a bridge over South river, on what the engineer states to be the nearest and best route. Below the spot where the bridge is to be built, there is already a permanent bridge over the same stream, authorized by an act of the legislature. This was originally a draw-bridge, but such was the trifling amount of the commerce carried on through and above the bridge, that the legislature a few years since was induced, for the greater convenience of the public, to authorize the bridge to be made permanent. Such being the case, it can scarcely be considered an unjustifiable act in the company to erect their bridge at the place selected, unless in so doing they entirely and knowingly cut off the trade of the relators, and make sacrifice of all their interests in that behalf; which is not pretended. It appears that they intend to leave a safe and convenient passage for scows, which is the only kind of boat that navigates that part of the stream; and if they should not, the parties injured will have a complete and summary remedy.

Another question has been made, which is proper to be considered. The act says, that when the route or routes and location of such road or roads shall have been determined upon, and a survey of such routes and location deposited in the office of the

secretary of state, then it shall be lawful for the company to enter upon and take possession of lands, &c. And it is insisted that no such survey has been filed, pursuant to the act; that the filing of the survey is a condition precedent, without which the proceedings of the company are void. On the other side it is insisted that a proper survey has been regularly filed in the office.

July, 1831.<br><br>The Attorney<br>General<br>v.<br>Stevens et al.

Two small books have been produced before the court. They contain, it is alleged, the courses and distances of the proposed railroad, from Camden to Amboy. They give the commencement of the road; the different stations made at the time of the survey; the course and distance between each station, and the number of stations to the termination of the road. This is supposed by some to be a survey, and by others to be none. If a survey necessarily, *ex vi termini*, means a map or profile of the route, then this is no survey in that sense of the term. But I am not satisfied that this is the case. They are sometimes used as convertible terms, but not always. In the act of 1719, for settling the boundary between East and West Jersey, a plain distinction is made between *books of surveys*, and *maps* or *draughts* of land. And generally, when the term *survey* is used in relation to the location of proprietary rights, it is understood to mean a description, in words or figures, of the lands located. Such are all the surveys, as recorded in the surveyor general's office, and the meaning of the term is there perfectly understood. By our road act, the surveyors laying out a public highway, are to make a return of the road, with a map or draught of the same, with the courses and distances. The term survey is not mentioned.

Upon the whole, I take the description returned and filed in the office, to be a survey within the meaning of the act; at all events so far forth as to warrant the court in refusing an injunction against the company, on the ground that no survey whatever has been filed. If a mistake has been made by the company, acting without fraud or corrupt intention, but seeking to comply with the requisitions of the law, it does not present a proper case for the interference of this court, by the extraordinary remedy of injunction.

The injunction is refused, with costs.