## EDWARD GOUGH v. MARY BELL.

1. The title to this country which vested in the British nation was that of discovery, and was held by the king in trust for the public, such matters as were part of the sovereignty or regalia, subject to the restrictions then imposed by the laws of England on their alienation.

2. The *crown* could not grant a several fishery in navigable rivers or arms of the sea; and *a fortiori* could not grant the soil under water, a grant which would involve the destruction of the fishery.

Gough v. Bell.

3. The right to navigable rivers and arms of the sea, was included in the surrender of the proprietors to Queen Anne, as part of the sovereignty; and at the Revolution vested in the State.

4. The *shore* of navigable rivers and arms of the sea where the tide ebbs and flows, which includes all between high and low water mark, is part of the sovereignty and belongs to the State, and not to the Riparian owners.

5. A Riparian owner by filling up in front of his premises does not acquire title to lands so filled up.

6. A boundary to, upon, or along a navigable river, bay, &c. in a question of property, as a grant of land, extends to high water mark only, in a question of jurisdiction, as of the common law courts, it extends to low water mark.

7. The grant by Carteret's charter to the town of Bergen, extends only *to* the shore, *i. e.* to high water mark.

8. The N. J. Proprietors cannot grant lands below high water mark.

9. The lands under water in navigable rivers, bays, and arms of the sea, are part of the public domain. The Legislature have a right to grant and alien them.

10. If a man grant land by deed with warranty, and afterward acquire title this after-acquired title enures to the benefit of his grantee

---

This was an action of trespass, *quare clausum fregit*, brought in this court against the defendant Mary Bell, for breaking and entering the plaintiff's close, and cutting his grass. The defendant pleaded title to the *locus in quo*. At the trial of the cause which was had before Justice Whitehead at the Hudson Circuit at the term of December 1844, the defendant gave in evidence a survey from the East Jersey Proprietors to Elisha Boudinot, dated March 21, 1803, and a deed from Elisha Boudinot to Nathaniel Budd, dated January 2d, 1804, for 53 1-2 acres of land (then) lying under water in a bay of the Hudson River next the shore, of which the *locus in quo* was proved to be part, having been since filled in. She then deduced title from Budd to herself. There was further given in evidence on part of the defendant an act of the Legislature passed November 8, 1836, granting the same lands to Nathaniel Budd, who had by a deed with warranty dated October 1st, 1835, conveyed the premises to Willis Hall, which deed to Hall is one through which the defendants claim.

Gough v. Bell.

The plaintiff gave in evidence the charter of the town of Bergen, granted by P. Carteret, Proprietary Governor, and his council, dated September 22, 1668, and a deed from the Trustees of said town of Bergen, dated February 4, 1804, including the *locus in quo*, to Wm. B. Coles, from whom plaintiff deduced title. Plaintiff also proved title to the land on shore adjoining the 53 1-2 acre tract, and the locus in quo, to show title thereto as Riparian proprietor. Both parties gave some evidence of possession at different times by those under whom they respectively claimed ; but not amounting to possessory title on either side.

The circuit Judge being of opinion that the case involved questions which ought to be reserved for the consideration of the court at bar, for that purpose charged the jury that no title passed by the deed from Boudinot, or by the act of the Legislature of November 8, 1836, and advised a verdict for the plaintiff.

The argument came on upon a rule to shew cause why the verdict should not be set aside, before Green, C. J., and Whitehead and Randolph, JJ.

*B. Williamson* and *Willis Hall* for the defendant.

*W. Rutherfurd* and *A. Whitehead* for plaintiff.

The opinion of the Court was delivered by

RANDOLPH, J.  The present motion is to set aside the verdict and grant a new trial on the ground of misdirection of the Judge.  The evidence of possession in either party was not very conclusive, it shewed what is considered a mixed possession, and was not in either of sufficient continuous duration, to create or materially affect the title of either party.  Both plaintiff and defendant claimed the premises under documentary titles, which were exhibited to the jury.  The defendant's title consisted, 1st of a survey from the East Jersey Proprietors to Elisha Boudinot, dated March 21, 1803, for fifty three acres and a half of land, lying under water in Harsimus Bay, and adjoining the upland, in the county of Hudson, and town of Bergen ; also sundry mesne conveyances from Boudinot to Bell

the defendant. 2ndly, an act of the Legislature of New Jersey, passed November 8, 1836, granting the same premises to Nathaniel Budd, he being the grantee from Boudinot, under whom defendant claims.

To this title various objections are taken, which may be hereafter considered. The plaintiff also claims title to the premises, in the 1st place by virtue of a grant from Governor Philip Carteret and his council, dated Sept. 22, 1668, to the Trustees of the town of Bergen, who on the 4th of February, 1804, conveyed the same by deed to John B. Coles, under whom plaintiff claims. 2nd, by a deed from John H. R. Kennedy and wife to John B. Coles, dated February 4, 1804, for the same premises. And 3rdly, as Riparian Proprietor of the adjoining upland, he being the undisputed owner thereof—and from a portion of which he has extended a wharf or pier into the river or bay, that however not being directly in controversy in this suit, the locus in quo being land, made or filled up within defendant's survey, on which the grass was growing, the cutting and carrying away of which constitute the trespass complained of.

The premises being below ordinary high-water mark, if included in the plaintiff's title, cannot of course belong to the defendant. Let us then examine the plaintiff's claim in the first place.

The Carteret and the Kennedy title are not sufficiently distinct to merit a separate consideration, they in fact embrace the same premises, at least so far as this case is affected, and their validity and extension depend on the same principles.

Had Gov. Carteret, or he and his council the right to grant, and if so, did they grant in the present instance this land below high-water mark ?

No doubt but the grants of New Jersey from King Charles to the Duke of York his brother, and from him to Berkley and Carteret, are more extensive than those under which some of the other colonists held their title ; they include not only the soil and the inland streams and ordinary appurtenances, but also all the harbors, waters, rivers, fishings, and all the royalties and profits, with full powers of government—embracing, so far as the King was able to grant them, the entire country and all its royalties, and the civil and political power of its government.

What then were the rights and powers of the King over the subject matter now under consideration?

The title to this country, according to the theory of the times, was that of discovery. It belonged to the British nation, but vested in the King as the head thereof, all below high-water as a part of the sovereignty or regalia, 2 *Bacon's Abr.* 177, 2 *Blk. Com.* 14, 104, yet he held them, as he did the sea and the arms thereof and the navigable rivers of Great Britain, in trust for the public. And although there are some old royal grants, under which exclusive fisheries are held in the tide-waters, and others are also claimed by prescription, yet these grants of the King were considered a usurpation upon the common rights of the people, the powers of Parliament, and the sixteenth chapter of Magna Charta, whilst it confirmed all such grants as were prior in date to the reign of Henry 2nd, restrained their being granted from that period. This is the view taken by Kirkpatrick, Ch. J., in *Arnold* v. *Mundy*, 1 *Halst.* 71–4, and is fully sustained by the authorities there referred to.

It is true this distinction is usually applied to the granting of a several fishery in navigable rivers or arms of the sea; but it is on the ground that it interferes with the rights of Parliament, or of the people to a common fishery, and if the mere interference with them by grant is void by Magna Charta, then surely their entire destruction by the absolute grant of the premises under water must be null also.

I am aware, however, that there has been much controversy respecting the effect of this clause in the great charter, and some very respectable authorities have given to it a different meaning from that adopted by the courts in this State. See *Rogers* v. *Jones*, 1 *Wend.* 237, and the authorities referred to there, and in *Arnold* v. *Mundy*, and in *Martin and al.* v. *Waddell's Lessee* 16 *Peters*, 369. In the latter case, the Ch. Just. (Taney) observing that " the existence of a doubt as to the right of the King to make such a grant after Magna Charta, would of itself show how fixed has been the policy of that government on this subject for the last six hundred years."

But whatever be the doubts respecting the power under the charter to grant, &c., it cannot very materially affect the ques-

tion under consideration. Whatever title the King and his grantees had to the navigable waters and to the arms of the sea, it must have been as part of the *jura regalia,* and not of the mere soil or propriety, the *jus publicum,* and not the *jus privatum* of the crown. This was never granted, but surrendered up by the proprietors to Queen Anne, in 1702. And it is upon this ground that the courts held in *Arnold* v. *Mundy,* and *Martin* v. *Waddell,* that a proprietary grant of the oyster beds or lands below high-water was of no validity.

The same point has been recently confirmed by the Supreme Court of the U. States, in *Pollard's Lessee* v. *Hogan and al.* 3 *Howard's R.* 212, where the question was, whether the shore of Mobile bay or river below high-water mark belonged to the U. States as part of the public domain, reserved when the State was admitted into the Union, or whether it passed and belonged to the State as part of her sovereignty; and the title under the State was held to be paramount.

The proprietors only surrendered to Queen Anne the sovereignty, and if that did not include the beds of the navigable rivers and arms of the sea, then they must still remain in the Proprietors. The grant of Carteret and Council did not include them, it was a mere grant of land, and if in it they could grant the regalia the Proprietors could under the same right still hold and grant them, notwithstanding the surrender.

But it is time to examine the grant itself. What does that include? The bounds and limits of the town of Bergen under this grant, begin on the north at a place called Mordanis' Meadow, lying upon the west side of the Hudson river, from thence it runs into the interior westerly, till it comes to the Hackensack river, thence along the same till it comes to the point or neck of land, over against Staten Island and Shooters Island, in Arthur Cull Bay, " from thence to run easterly along the river Kill Van Cull, that parts Staten Island and the Maine, to a point or neck of land called Constables Point or Constables Hook, and from thence to run up northward all along the Bay into Hudsons river, till it comes to Mordanis' Meadow aforesaid." So that the whole tract of upland and meadow property belonging to the jurisdiction of the said town and corporation of Bergen,

is bounded at the north end by a tract of land belonging to N. V. & S. E., on the east side by Hudson's river, on the south end by Kill Van Cull, that parts Staten Island and the Maine, on the west side by Arthur Cull Bay and Hackensack river. "The whole, both upland and meadow and waste land, containing 11,520 acres," together with all rivers, ponds, creeks, bays &c., and all the appurtenances whatever thereunto belonging, or appertaining—the said corporation submitting themselves to the Lords Proprietors and the Government of the Province. In the case of the Royal Fishery in the River Banne, *Davies' R.* 149, it was resolved by the court that nothing passed by implication against the King, and that mere general words did not extend the grant beyond the land itself. And in *Storer* v. *Freeman*, 6 *Mass.* 436–8, Parsons, Ch. J., held, that a grant "to the shore, thence by the shore," or "to a heap of stones at the shore, thence by the shore," did not include the flats or lands under water. And the principle is well settled that whilst a boundary on a non-navigable stream extends *ad medium filum aquæ*, yet when on bays, arms of the sea, and navigable rivers, it reaches only to the shore or ordinary high-water mark, 4 *Burr*, 2,164— 6 *Cowen*, 518—*Ibid.* 533–4; 1 *Halst.* 1. This grant then only extends to the shore, the rivers, creeks, bays, &c., must be construed to mean only such as are embraced within the deed itself, for the whole was to be subject to the Lords Proprietors and the Government of the Province, nothing therefore passed but what the grant embraced, nothing but the soil and the necessary appendages thereto.

The Plaintiff then only stands in relation to the premises in question as a Riparian proprietor. What are his rights as such?

In the first place those rights extend directly only to high-water mark, according to the principles of the common law; and not to low-water mark, as would seem to be the doctrine in Massachusetts, Maine, and perhaps some other States, by virtue of some old ordinances or statutory provisions—See *Storer* v. *Freeman*, before cited, and 8 *Greenlf.* 85. All between ordinary high and low-water mark is embraced under the denomination of the shore, and belongs to the King or the State. *Hargrave Tracts*, 12–13—2 *Jno. R.* 362—3 *Kent*, 347—*Dyer*, 326—

6 *Cowen*, 543—*Blundell* v. *Catterall*, 5 *B.* and *Ald.* 268. The tide must ebb and flow, and the stream be navigable for some useful purpose, the mere oozing or flowing up through a salt marsh not being sufficient to constitute that a part of the river or shore—*Rowe* v. *Granite Bridge Co.* 21 *Pick.* 344—and in several of the States the large fresh-water rivers, and for the purposes of navigation are placed on the footing of arms of the sea though there be no ebb and flow of the tide. *Angell on Tide Waters*, 77—(2nd edition.)

On the trial of *Arnold* v. *Mundy*, the Chief Justice intimates that the ownership of the upland extended to low-water—*See* 1 *Halst. p.* 10—but in his opinion after the argument at bar, he lays down the common law principle very clearly—*page* 67—he says that " a grant of land bounded upon a river or other water which is navigable, and where the tide does ebb and flow, extends to the edge of the water only, that is to say to high-water mark, and no further." Again as to possession, " the grant for that could extend only to high-water mark, and it could therefore carry with it no part of the adjacent land covered with water." When it *is a mere* question of jurisdiction, that of the common law courts will be held to extend to low-water mark. *Constable's Case*, 5 *Rep.* 107 (2.) So in a prosecution for a nuisance, though below low-water, it will not be disturbed unless it affect the *jus publicum*, the right of navigation or fishing. 1 *Anst. R.*, 605—8 *Bro. Parc. Cas.* 119—*do.* 18. If the right of the Riparian Proprietor extends only to high-water mark, then of course the plaintiff under such claim can have no rights either to the flats or to the land covered with water. We are not now called on to determine a right of docking out, under the incorporation of " the Associates of the Jersey Company," granted by the Legislature, November 10, 1804. That depends on very different principles from the Grants of the King or of his grantees. By it Jersey City is bounded " East by Hudson river, on the north by said river or the bay commonly called Harsimus Bay." The 3d section gives full power to build wharves, docks and piers in Hudsons river or the bays thereof, as far as they may deem it necessary, &c. This power, though older than the defendant's title to the premises now in dispute, is much younger

than the Carteret grant, and would be entirely unnecessary if the powers contended for by plaintiff existed under that grant.

Although the plaintiff's title may not extend below high-water mark, yet under the plea in this case, he has a right to judgment unless the defendant can sustain that plea by shewing title. It appears from the evidence, that about the year 1801, and for some years after that period, Nathaniel Budd was in possession of the premises now owned by the plaintiff, or some part thereof, and established a ferry and kept a ferry-house thereon, that owing to a dispute about the title amongst different claimants, he himself applied to the Legislature, and got a law passed for laying out and establishing roads to the ferry : for some cause he did not become the owner of the property he then occupied, but on the second of January, 1804, he obtained from Elisha Boudinot a deed for the fifty-three acres and a half of land lying under water, and in part adjoining the plaintiff's lot. This title is derived from the East Jersey proprietors, under the notion which then and for a long time afterwards prevailed, that under the grants of King Charles, and the Duke of York, the land under the harbors, rivers and waters, belonged to the proprietors. 4 *Griff. Reg.* 1286 ; *Angell on Tide Waters*, 44, 57–8 But this idea no longer prevails ; the case of *Arnold* v. *Mundy*, in the Supreme Court of this state, and of *Martin* v. *Waddell's Lessee*, in the Supreme Court of the United States, 16 *Peters* 369 ; 3 *Harr*. 495, have settled the question as to the right of the proprietors. It does not extend to land under water, so that although the defendant has adduced a regular chain of title under the proprietors, that of itself can be of little avail ; but in addition thereto, she claims, by virtue of an act of the Legislature, passed Nov. 8, 1836, vesting in N. Budd, his heirs, and assigns, the title of the State to this fifty-three and a half acres. To this Legislative grant several exceptions are taken ; in the first place it is said that the grant was made to Budd about a year after he had conveyed the premises to Hall ; this appears to be the case, yet that cannot of itself render the grant inoperative, for it specifies the premises as held under the deed from Elisha Boudinot, and is made to Budd, his heirs and assigns, and if a good title is thus created, it will of course, by a

well-settled principle of law enure to the benefit of his grantee, or assignee, holding by warrantee.

According to *Arnold* v. *Mundy, page* 78, the land under navigable rivers and bays being originally held by the proprietors as part of the common property in trust for the public, and surrendered to Queen Anne in 1702, vested by the Revolution in the sovereignty of the State, and is held under the guardianship of the Legislature. But there are some species of common property, such as light and air, which cannot be granted, and it is insisted that this is of that character—but I do not so consider it: it rather partakes of the character of the public domain; it may be leased or granted away by the State, or disposed of in any other way so as not to interfere with, or impair the public right of navigation, or the power of the general government to regulate commerce and navigation in bays and harbors. I am aware of no constitutional restriction on the Legislature to pass an act of the kind now under consideration. It impairs the obligation of no contract, it takes no private property for public use without compensation; but, on the contrary, converts the public property into private use, rendering such compensation as the Legislature may require. See *Doug* 441; *Lansing* v. *Smith,* 8 *Cowen* 146; the same case in Error, 4 *Wend.* 9, and the various acts of the Legislature granting power to individuals and corporations to build wharves and piers, and to dam navigable streams. Also, the law authorizing lands under water to be leased for the planting of oysters.

If it be correct that the beds of the navigable streams, bays, and arms of the sea, belong to the public, and neither to the board of proprietors, or to the riparian owners—then, as a matter of course, the Legislature must take charge of them for the public, whose interest will require that they be granted to individuals, to be used for wharves and other purposes. This, like all other legislative power, must be exercised under the sound discretion of the Legislature, uncontrolled by judicial or other interference. It is our duty to ascertain the meaning of a statute, whether public or private, and to put the true construction thereon, though the effect of that be to impair, or even abrogate

VOL. I.                    L

the law itself, or to declare it void under the Constitution. But we cannot inquire into the motives, the intelligence, or the wisdom of the Legislature, especially in this incidental manner; nor have we the power of supervision, or of rescinding their grants, as being improvidently allowed. It is enough for us to know that they exercised their discretion within their constitutional power, and neither fraud nor imposition can be presumed or supposed to have influenced their course of proceeding. As a general rule, it would seem reasonable that the riparian owners should have the pre-emption for. a reasonable time, of the shores and flats adjoining their premises; but until there be a general law on the subject, that must rest with the discretion of the Legislature. The court below having entirely rejected the defendant's title, which covers the *locus in quo*, I think the verdict should be set aside and a new trial granted. (*a.*)

Verdict set aside and a new trial granted.

---

*Note* (*a*). In the elaborate opinion given by that learned and eminent lawyer, John Sergeant, of Philadelphia, in support of his award upon the title to the Pea Patch Island in the Delaware (as published in Senate Ex. Doc. No. 21, 1848), the main principles of this case, and of the U. S. Supreme Court in *Martin* v. *Waddell's Lessee*, are explicitly acknowledged and adopted by the arbitrator, and applied as an answer to the Gale title claimed under the West Jersey proprietors—p. 225. But he seems to have overlooked, or has failed to apply, these principles in the consideration of the title of the State of Delaware, to which they would seem equally applicable. The question before him upon the Gale title under the Act of New Jersey, was simply, whether the Island was in the State of New Jersey, or in the State of Delaware. And to settle this fact, it was necessary to ascertain where the boundary line between the two States was when both became independent States on July 4, 1776.

. Although this award has no binding force on either State, yet it is to be .regretted that a matter involving the disputed, and hitherto unsettled, boundary of New Jersey, should have been submitted to any tribunal where the State, or any of its citizens were not represented, and where the counsel, however learned and eminent, were strangers to New Jersey, her history and laws, especially in a case where the high standing of the arbitrator, the ability of counsel, the amount in dispute, and the fact that the Federal Government was one of the parties, were all calculated to give the decision an incidental importance beyond its binding force.

The question, what was the boundary between these States at the Revolution, was to be decided either by what was the acknowledged line to which Jurisdiction had been exercised, or by documentary evidence of title; as there was in fact no acknowledged line, except the indefinite one of the river Delaware, the arbitrator has put it upon the documentary title, and has endeavored to sustain his decision by an argument on the technical effect of the deeds to Penn for the 12 mile circle about Newcastle.

Now, the point of the decision in the case in the text, and in *Martin v. Waddell's Lessee* is this, that navigable rivers, &c. and *a fortiori* the soil under them, *jura regalia*, inalienable by the king since Magna Charta, inseparable from the powers of government, passing with them, without being named, as an incident, whenever they pass, and remaining, when they remain. The peculiar language of the instrument of surrender on which these decisions are founded, leaves this without doubt; it enumerates *certain* powers of government at length, concluding with "all powers for the government of the province or the inhabitants thereof;" and the navigable rivers and their soil were held to be thereby surrendered as an inseparable incident to the powers of government.

· The deed from the Duke of York to Penn, of August 24, 1682, for the 12 mile circle (award, p. 11), conveys only *property*, a tract of land, the river, and the soil thereof, without the right of government. By this deed, then, the power of government was left in the king or Duke, wherever it had been before the date of it; and if so, then also the *regalia*, including the right to the soil under the river as an inseparable incident to the power of government. That Penn, either as proprietary of Pennsylvania, or of Newcastle, exercised *permissively* (and it was only permissively), powers of government within the circle, might by prescription confer jurisdiction so far as *in fact* they were exercised, but would add no force to this deed; nor on the other hand, would the deed extend the prescriptive jurisdiction beyond the limits of its actual exercise.

The title relied on, as the Duke had none in 1682, is by estoppel, under the Royal grant of March 22, 1683. Passing by the question whether any deed which does not *take effect* as a feoffment, or contain a technical warranty, can operate as a conveyance, or have any effect except to estop the *grantor* from averring contrary thereto, the application of the doctrine of estoppel meets with this difficulty, as the deed of 1682 did not grant powers of government, and the *jura regalia* as an inseparable incident to them would have remained in the Duke had they been vested in him, of course the estoppel would not pass more than the original deed on which it is founded would have done, if the grantor then had title.

Again, without mooting the position taken for granted by the arbitrator, that govermental powers and jura regalia will pass by estoppel, according to the technical common law rules for conveying *real estate*, which to say the

Gough v. Bell.

least is doubtful,* the arbitrator seems also to have overlooked the doctrine of estoppel when it would apply to the New Jersey title. The duke of York, by deed of grant, bargain and sale, dated August 6, 1680 (*Award*, p. 26; *Leam. & Spic.* p. 412), granted to the West Jersey proprietors the territory of West Jersey, annexing these words, "and also the free use of all bays, rivers, and waters leading *unto*† or lying between the said premises for navigation, free trade, fishing, *or otherwise*," with express powers of government. Now if, as is well settled, the grant of the absolute use of a thing is a grant of the thing itself, then as the limitations on the use in this case are enlarged by the words "or otherwise" into the absolute use, the river Delaware, or at least the easterly half *leading unto* West Jersey passed, except for that the Duke had yet no title. And when the Duke by the Royal grant of March 22, 1683, became seised of the soil of the river within the 12 miles circle with powers of government, it passed by the estoppel to the West Jersey Proprietors under the Duke's deed of August 6, 1680, as older in date than his grant to Penn of August 24, 1682. Both deeds are on the same footing as to their quality; for the deed to Penn, although it contains words of feoffment, also contains the words "bargain and sell," which by the statute of uses, then in force, gave to him on delivery of the deed, the seisin, or feudal investiture; and the after ceremonies of livery of seisin by the Duke's attorneys were a *nullity*, as the Duke could not deliver that seisin which by the statute had two months before passed out of him into Penn; both deeds *took effect* under the Statute of Uses.

The effect of the deed of 1680 is stated by Washington, J. in 4 *W. C. C. R.* 386. He says the only objection to it was that the Duke had himself no title; the doctrine of estoppel was not before him, as this grant to the Duke of March 22, 1683, which "feeds the estoppel," had not then been discovered. He relied on the *user* of New Jersey under this apparently void deed, as giving her a title to the middle of the Delaware.

Again, it is with all deference suggested that the arbitrator has not fairly stated the opinion of Justice Washington on the point before him as given in *Corfield* v. *Coryell;* he cites him (*Award*, p. 230) as authority, that New Jersey is bounded on the west by low water mark in Delaware River and Bay. Judge W. indeed, says, in speaking of the Duke's grant of June 24, 1684, (4 *W. C. C. R.* 384), that the claim of New Jersey *under these grants* (the italics are his own), to any part of the bay or river Delaware below low water mark cannot be maintained:" but in page 386 he expressly lays it down, and decides as the law of the case, that the boundary of New Jersey extend-

---

*The Lords of Trade held that they could not be *re*-granted at all. *Smith's History of New Jersey*, p. 569.

†Misprinted *into* in *Award* p. 26. Also, in Gen. Wall's Brief, in *Sen. Doc.* No. 140 of 1838, p. 29. Also, in 4 *W. C. C. R.* 386—Vide aliter *L. & S.* 417 & 148.

ed to the middle of the bay as between her and Delaware. This opinion on the *State boundary* is on the very point before him, but is not noticed; he only quotes the part which refers to the *proprietary title* which he is not *then* considering.

Judge Baldwin, in *Gale's Lessee* v. *Beling*, arrives on both points to the same conclusion with Judge Washington, and his opinion is also in like partial manner quoted as sustaining the arbitrator's view when the result at which he arrived, from the whole case, was contrary to it. (See Baldwin's Charge in *Sen. Doc. No.* 140 *of* 1838, *p.* 48).

But, laying aside all technical, narrow views of the case, the great rules that ought to have controlled this decision are those laid down by Justice RANDOLPH in the text. That the King of England held this country as part of the public domain, subject to the same restrictions as were then by law imposed upon him in England. That he there held the great rivers and the soil thereof in trust for *all* his subjects, and could not alien or appropriate them to some of them in exclusion of others. That any grant of the river Delaware to Penn, was subject to those rights in his subjects to whom he had granted, and who had settled on the east shore of the Delaware. That they retained a right in the Delaware equal to that of Penn or his grantees until the revolution; and each having this equal right until then, there was then no obstacle to the application of the rule established *jure gentium*, that when two States border on a river to which neither has prior or better right, each holds to the middle of the stream.

The reporter felt that as a Jerseyman he could not pass a case in which these great principles were reaffirmed, without making some observations on what appeared to him to be the misapplication of them by Mr. Sargeant to the rights of New Jersey. Those observations have unintentionally expanded into this long note.

CITED *in Gough* v. *Bell*, 2 *Zab.* 486; *Bell* v. *Gough*, 3 *Zab.* 658–667–674; *Stevens* v. *Paterson & N. Y. R. R. Co.*, 5 *Vr.* 567; *Paul* v. *Hazelton*, 8 *Vr.* 107; *Wooley* v. *Campbell*, 8 *Vr.* 166; *Wilson* v. *King*, 8 *C. E. Gr.* 155.