Mr. Chief Justice Taney
delivered the opinion of the Court.
This case is brought here by writ of error, from the Circuit Court of the United States, for the District of New-Jer'sey. It was fully argued at the last term. But it was not then decided, because the important principles involved in it, made it proper that the case should be heard and determined by a full court; and as some of the justices were not present at the former hearing, a re-argument was ordered. In pursuance of this order, it has been again elaborately discussed by counsel; and, having been carefully considered by the court, I am instructed to deliver their opinion.
The questions before us arise upon an action of ejectment, instituted by the defendant in error, who was the plaintiff in the court below, to recover one hundred acres of land, covered with water, situate in the township of Perth A.mboy, in the State of New-Jersey. At the trial, in the circuit court, the jury found a special verdict, setting forth, among other things, that the land claimed lies beneath the navigable waters of the Raritan River and Bay, where the tide ebbs and flows. And it appears that the principle matter in dispute, is the right to the Oyster Fishery, in the public rivers and bays of East New-Jersey.
The plaintiffs make title under the charters granted by Charles *497 the Second, to his brother the Duke of York, in 1064 and 1674, for the purpose of enabling him to plant a colony on this continent. The last mentioned grant is precisely similar to the former in every respect, and was made for the purpose of removing doubts which had then arisen as, to the validity of the first.
The boundaries in the two charters are the same, and they embrace the territory which now forms the State of New-Jersey. The part of this territory known as East New-Jersey, after-wards, by sundry deeds and conveyances, which it is not necessary to enumerate, was transferred to twenty-four persons, who were called the Proprietors of East New-Jersey, who, by the terms of the grant, were invested, within the portion of the territory conveyed to them, with all the rights of property and government which had been originally conferred on the Duke of York, by the letters patent of the king. Some serious difficulties however, took place, in a short time, between these Proprietors and the British authorities, and after some negotiations upon the subject, they, in 1702, surrendered to the crown, all the powers of government, retaining their rights of private property.
The defendant in error claims the land covered with water, mentioned in the declaration, by virtue of a survey made in 1834, under the authority of the Proprietors, and duly recorded in the proper office. And if they were authorized to make this grant, he is entitled to the premises as owner of the soil, and has an exclusive right to the fishery in question. The plaintiffs in error also claim an exclusive right to take oysters in the same place, and derive their title under a law of the State of New-Jersey, passed in 1824, and a supplement thereto,,passed in the same year. The point in dispute between the parties, therefore, depends upon the construction and legal effect of the letters patent to the Duke of York, and of the deed of surrender subsequently made by the Proprietors. The letters patent to the Duke included a very large territory, extending along the Atlantic coast from the river St. Croix to the Delaware Bay, and containing within it many navigable rivers, bays and arms of the sea, and after granting the tract of country and islands therein described, “ together with all the lands, islands, soils, rivers, harbors, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawk *498 ings, huntings and fowlings, and all other royalties, profits, commodities and hereditaments to the said several islands, lands and premises belonging and appertaining with their and every of their appurtenances j” and “ all the estate right, title, interest, benefit, and advantage, claim and demand of the king in the said lands and premises the letters patent proceed to confer upon him, his heirs, deputies, agents, commissioners and assigns, the powers of government, with a proviso that the statutes, ordinances and proceedings, established by his authority should “ not be contrary to, but as nearly as might be, agreeable to the laws, statutes and government of the realm of England; saving also an appeal to the king in all cases from any judgment or sentences A Inch might be given in the colony, and authorizing the duke, his heirs and assigns, to lead and transport, out of any of the realms of the king, to the country granted, all such and so many of his subjects or strangers not prohibited or under restraint, who would become the “ loving subjects ” of the king, and live under his allegiance, and who should willingly accompany the duke, his heirs and assigns.
The right of the king to make this grant, with all of its prerogatives and powers of government, cannot at this day be questioned. But in order to enable-us to determine the nature and extent of the interest which it conveyed to the duke, it is proper to enquire into the character of the right claimed by the British crown, in the country discovered by its subjects, on this continent, and the principles upon which it was parcelled out and granted. The English possessions in America, were not claimed by right of conquest, but by right of discovery. For, according to the principles of international law, as then understood by the civilized powers of Europe, the Indian Tribes in the new world, were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the European nation by which any particular portion of the country was first discovered. Whatever forbearance may have been sometimes practised towards the unfortunate aborigines, either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe, at their pleasure, as if it had been found without inhabitants. The grant to the Duke of York, therefore, was not of lands won by the sword, nor *499 were the government and laws he was authorised to establish, intended for a conquered people.
The country mentioned in the letters patent, was held by the king, in his public and regal character as the representative of the nation, and in trust for them. The discoveries made by persons acting under the authority of the government, were for the benefit of the nation; and the crown, according to the principles of the British constitution, was the proper organ to dispose of the public domain : and, upon these principles, rest the various charters and grants of territory made on this continent. The doctrine, upon this subject, is clearly stated in the case of Johnson v. McIntosh, 8 Wheat. 595. In that case, the court, after stating it to be a principle of universal law, that an uninhabited country, if discovered by a number of individuals who owe no allegiance to any government, becomes the property of the discoverers ; proceed to say, that “ if the discovery be made and possession taken under the authority of an existing government which is acknowledged by the emigrants, it is supposed to be equally well settled that the discovery is made for the benefit of the whole nation, and the vacant soil is to be disposed of'by that organ of the government which has the constitutional power to dispose of the national domains; by that organ in which all the vacant territory is vested by law. According to the theory of the British constitution, all vacant lands are vested in the crown as representing the nation, and the exclusive power to grant them is admitted to reside in the crown, as a branch of the royal prerogative. It has been already shown, that this principle was as fully recognized in America, as in the island of Great Britain.” This being the principle upon which the charter in question was founded, by what rules ought it to be construed ?
We do not propose to meddle with the point which was very much discussed at the bar, as to the power of the king, since Magna Charta, to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery either for shell fish or floating fish, within the limits of his grant. The question is not free from doubt, and the authorities referred to in the English books, cannot, perhaps, be altogether reconciled. But, from the opinions expressed by the justices of the Court of King’s Bench, *500 in the case of Blundell v. Catterall, 5 Barn, and Ald. 287, 294, 304, 309, and in the case of The Duke of Somerset v. Fogwell, 5 Barn, and Cres. 883, 884, the question must be regarded as settled in England, against the right of the king, since Magna Charta, to make such a grant. The point does not, however, arise in this case, unless it shall first be decided that in the grant to the Duke of York, the king intended to sever the bottoms of the navigable waters, from the prerogative powers of government, conferred by the same charter, and to convert them into mere franchises in the hands of a subject, to be held and used as his private property. And we the more willingly forbear to express an opinion on this subject, because it has ceased to be a matter of much interest in the United States. Por when the revolution took place, the people of each state became themselves sovereign, and, in that character, held the absolute right to all their navigable waters and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government. A grant made by their authority must, therefore, manifestly be tried and determined by different principles from those which apply to grants of the British 'Crown, where the title is held by a single individual in trust for the whole nation. Neither is it necessary to examine the inany cases which have been cited in the argument on both sides, to show the degree of strictness with which grants of the king are to be construed. The decisions and authorities referred to, apply more properly to a grant of some prerogative right to an individual, to be held by him as a franchise, and which is intended to become private property in his hands. The dominion and property in navigable waters, and in the lands under them, being held by the king as a public trust, the grant to an individual of an exclusive fishery, in any portion of it, is so much taken from the common fund, intrusted to his care for the common benefit. In such cases, whatever does not pass by the grant, still remains in the crown for the benefit and advantage of the whole community. Grants of that description are therefore construed strictly, and it will not be presumed that he intended to part from any portion of the public domain, unless clear and especial words are used to denote it. But in the case before us, the rivers, bays, and arms of the sea, and all prerogative rights *501 within the limits of the charter, undoubtedly passed to the Duke of York, and were intended to pass, except those saved in the letters patent. The words used, evidently show this intention, and there is no room, therefore, for the application of the rule above mentioned. The questions upon this charter, are very different ones. They are, whether the dominion and propriety in the navigable waters, and in the soil under them, passed as a part of the prerogative rights annexed to the political powers conferred on the Duke? Whether, in his hands, they were intended to be a trust for the common use of the new community, about to be established, or private property to be parcelled out and sold to individuals, for his own benefit. And in deciding a question like this, we must not look merely to the strict technical meaning of the words of the letters patent. The laws and institutions of England, the history of the times, the object of the charter, the cotemporaneous construction given to it, and the usages under it, for the century and more, which has since elapsed, are all entitled to consideration and weight. It is not a deed conveying private property to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the institutions of a great political community, and in that light it should be regarded and construed.
Taking this rule for our guide, we can entertain no doubt as to the true construction of these letters patent. The object in view appears upon the face of them. They were made for the purpose of enabling the Duke of York to establish a colony upon the newly discovered continent, to bo governed as nearly as circumstances would permit, according to the laws and usages of England, and in which the duke, his heirs and assigns, were to stand in the place of the king, and administer the government according to the principles of the British constitution. And the people who were to plant this colony and to form the political body over which he was to rule, were subjects of Great Britain, accustomed to be governed according to its usages and laws.
It is said by Hale, in his Treatise de jure maris, Har'g. Law tracts, 11, when speaking of the navigable waters, and the sea on the coasts within the jurisdiction of the British Crown, that “Although the king is the owner of this great waste, and, as a consequent, of his propriety, hath the primary right of fishing in *502 the sea, and creeks and arms thereof; yet the common people of England have regularly a liberty of fishing in the sea, or creeks or arms thereof, as a public common of piscary, and may not, without injury to their right, be restrained of it, unless in .such places, creeks or navigable rivers, when either the king, or some particular subject, hath gained a propriety exclusive of that common liberty.”
The principle here stated by Hale, as to “the public common of piscary” belonging to the common people of England, is not questioned by any English writer upon that subject.
The point upon which different opinions have been expressed, is whether since Mágna Charta, either the King or any particular subject can gain a propriety exclusive of the common liberty'. For undoubtedly, rights of fishery exclusive of the common liberty, are at this day held and enjoyed by private individuals under ancient grants. Rut the existence of a doubt as to the right of the King, to make such a grant after Magna Charta, would of itself show how fixed has been the policy of that government on this subject for the last six hundred years; and how carefully it has preserved this common right for the benefit of the public. And there is nothing in the charter before us indicating that a different and opposite line of policy was designed to be adopted in that colony. On the contrary, after enumerating in the cause herein before quoted, some of the prerogative rights annexed to the Crown, but not all of them, general words are used conveying “all the estate, right, title, interest, benefit, advantage, claim and demand ” of the King, in the lands and premises before granted. The estate and rights of the King, passed to the Duke, in the same condition in which they had been held by the Crown, and upon the same trusts. Whatever was held by the King as a prerogative right, passed to the Duke in the same character. And if the word soils, be an appropriate word to pass lands covered with navigable water, as contended for on the part of the defendant in error, it is associated in the letters patent, with “other royalties,” and conveyed as such. No words are used for the purpose of separating them from the jura regalia, and converting them into private property, to be held and enjoyed by the Duke, apart from and independent of the political character with which he was clothed by the same *503 instrument. Upon a different construction, it would have been impossible for him to have complied with the conditions of the grant. For it was expressly enjoined upon him as a duty in the government he was about to establish, to make it as near as might be agreeable in their new circumstances, to the laws and statutes of England ; and how could this be done if in the charter itself, this high prerogative trust, was severed from the regal authority.” If the shores and rivers and bays and arms of the sea, and the land under them, instead of being held as a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well- for shell fish as floating fish, had been converted by the charter itself into private property to be parcelled out and sold by the Duke for his own individual emolument ? There is nothing we think in the terms of the letters patent, or in the purposes for which it was granted that would justify this construction. And in the judgment of the court the land under the navigable waters, passed to the grantee as one of the royalties incident to the powers of government: and were to be held by him in the same manner and for the same purposes, that the navigable waters of England, and the soils under them, are held by the Crown.
This opinion is confirmed by referring to similar grants for other tracts of country upon this continent, made about the same period of lime. Various other charters for large territories on the Atlantic coast, were granted by different monarchs of the Stuart dynasty, to different persons, for the purpose of settlement and colonization, in which the powers of government were united with the grant of territory. Some of these charters very nearly resembled in every respect, the one now in controversy; and none of them it is believed differed materially from it, in the terms in which the bays, rivers and arms of the sea, and the soils under them were conveyed to the grantees. Yet in no one of these colonics, has the soil under its navigable waters, and the rights of fishery for shell fish or floating fish, been severed by the letters patent, from the powers of government. In all of them from the time of the settlement to the present day, the previous habits and usages of the colonists have been respected, and they have been accustomed to enjoy in common, the benefits and advantages of the navigable waters, for the same purposes and *504 to the same extent that they have been used and enjoyed for centuries, in England; indeed it could not well have been otherwise. For the men who first formed the English settlements, could not have been expected to encounter the many hardships that unavoidably attended their emigration to the new world, and to people the banks of its bays and rivers, if the land under the water at their very doors, was liable to immediate appropriation by another, as private property; and the settler upon the fast lands thereby excluded from its enjoyment, and unable to take a shell fish from its bottom, or fasten there a stake, or even bathe in its waters without becoming a trespasser upon the rights of another. The usage'in New Jersey has in this respect, from its original settlement, conformed to the practice of the other chartered colonies. And it would require very plain language in these letters patent, to persuade us that the public and common right of fishery in navigable waters, which has been so long and so carefully guarded in England, and which was preserved in every other colony founded on the Atlantic borders, was intended in this one instance to be taken away. But we see nothing in the charter to require this conclusion.
The same principles upon which the court have decided upon the construction of the letters patent to the Duke of York, apply with equal force to the surrender afterwards made by the twenty-four Proprietors. It appears by the special verdict, that all the interest of the Duke in East New Jersey, including the royalties and powers of government, were conveyed to these Proprietors, as fully and amply and in the same condition, as they had been granted to him; and they had the same dominion and propriety in the bays and rivers and arms of the sea, and the soil under them, and in the rights of fishery, that had belonged to him under the original charter. In their hands therefore as well as in those of the Duke, this dominion and propriety, was an incident to the regal authority, and was held by them as a prerogative right, associated with the powers of government. And being thus entitled, they in 1702, surrendered and yielded up to Anne Queen of England, and to her heirs and successors, all the powers and authorities in the said letters patent granted to correct, punish, pardon, govern and rule all or any of her Majesty’s subjects or others who then were inhabitants, or thereafter *505 might adventure into, or inhabit within the said province of East New Jersey; and also to nominate, make, constitute, ordain and confirm any laws, orders, ordinances, directions and instruments for those purposes or any of them, and to nominate, constitute or appoint, revoke, discharge, change or alter any governor or governors, officers or ministers, which were or should be appointed within the said province, and to make, ordain and establish, any orders, laws, directions, instruments, forms or ceremonies of government and magistracy, for or concerning the same, or oil the sea in going to or" coming from the same, or to put in execution or abrogate, revoke or change, such as were already made, for or concerning such government, or any of them, and also all the powers and authorities by the said letters patent, to use and exercise martial law, in the said province of East New Jersey; and to admit any person, or persons to trade or traffic there; and of encountering, repelling and resisting by force of arms, any person or persons attempting to inhabit there without the license of them the said proprietors, their heirs and assigns; and all other the powers, authorities and privileges of and concerning the government of the province last aforesaid, or the inhabitants thereof, which were granted or mentioned to be granted by the said several above recited letters patent or either of them ;” which said surrender was afterwards accepted by the Queen.
We give the words of the surrender as found by the special verdict, and they are broad enough to cover all the jura regalia which belonged to the proprietors. They yield up “ all the powers, authorities and privileges of and concerning the government of the province; ” and the right in dispute was one of these authorities and privileges. No words are used for the purpose of withholding from the Grown, any of its ordinary and well known prerogatives. The surrender according to its evident object and meaning, restored them in the same plight and condition in which they originally came to the hands of the Duke of York. Whatever he held as a royal or prerogative right, was restored with the political power to which it was incident. And if the great right of dominion and ownership in the rivers, bays and arms of the sea, and the soils under them, were to have been severed from the sovereignty, and withheld from the crown *506 if the right of common fishery for the common people, stated by Hale in the passage before quoted, was intended to be withdrawn, the design to make this important change in this particular territory, would have been clearly indicated by appropriate terms; and would not have been left for inference from ambiguous language.
The negotiations previous to the surrender have been referred to, in order to influence the construction of the deed. But whatever propositions may have been made, or opinions expressed before the execution of that instrument, the deed itself must be regarded as the final agreement between the parties; and that deed by its plain words, reestablished the authority of the Crown, with all of its customary powers and privileges. And when the people of New Jersey took possession of the reins of government, and took into tneir own hands the powers of sovereignty, the prerogatives and regalities which before belonged either to the crown or the parliament became immediately and rightfully vested in the State.
This construction of the surrender, is evidently the same with that which it received from all the parties interested at the time it was executed. For it appears by the history of New Jersey, as gathered from the' acts, documents and proceedings of the public authorities, that the crown and the provincial government established by its authority always afterwards in this territory, exercised the same prerogative powers, that the King was accustomed to exercise in his English dominions. And as concerns the particular dominion and propriety now in question, the Colonial government from time to time authorized the construction of bridges with abutments on the soil covered by navigable waters, established ports, authorized the erection of .wharves, and as early as 1719, passed a law for the preservation of the oyster fishery, in its waters. The public usages also in relation to the fisheries,’ continued to be the same. And from 1702 when the surrender was made, until a very recent date, the people of New Jersey have exercised and enjoyed the rights of fishery, for shell fish and floating fish, as a common and undoubted right, without opposition or remonstrance from the proprietors.
The few unimportant grants made by them, at different times, running into the navigable waters, which were produced in the *507 argument, do not appear to have been recognized as valid, by the provincial or state authorities, nor to have been sanctioned by the courts. And the right now claimed was not seriously asserted on their part, before the case of Arnold v. Mundy, reported in 1 Halsted 1, in which the suit was not instituted until the year 1818. And upon that occasion, the Supreme Court of the State held that the claim made by the proprietors was without foundation.
The éffect of this decision by the State Court, has been a good deal discussed at the bar.
It is insisted by the plaintiffs in error, that as the matter in dispute, is local in its character; and the controversy concerns only fixed property within the limits of New Jersey, the decision of her tribunals ought to settle the construction of the charter, and that the courts of the United States are bound to follow it. It may however be doubted, whether this case falls within the rule in relation to the judgments of State Courts, when expounding their own constitutions and laws. The question here depends not upon the meaning of instruments framed by the people of New Jersey, or by their authority, but upon charters granted by the British crown, under which certain rights are claimed by the state on the one hand, and by private individuals on the other. And if this court had been of opinion, that upon the face of these letters patent, the question was clearly against the state, and that the proprietors had been deprived of their just rights, by the erroneous judgment of the State' Court, it would perhaps be difficult to maintain, that this decision of itself bound the conscience of this court. It is however unquestionably entitled to great weight. It confirms the construction uniformly placed on these charters and instruments, by the other public authorities ; and in which the Proprietors had so long acquiesced. Public acts and laws both of the Colonial and State governments, have been founded upon this interpretation, and extensive and valuable improvements made under it. In the case referred to, the sanction of the judicial authority of the State, is given to it. And if the words of the letters patent had been far more doubtful than they are, this decision made upon such a question, with great deliberation and research, ought in our judgment to be regarded as conclusive.
*508 Independently however of the decision of the Supreme Court of New Jersey, we are of opinion, that the Proprietors are not entitled to the right in question, and the judgment of the Circuit Court must therefore be reversed.

Judgment of Circuit Court reversed.

Cited in Gough v. Bell, 1 Zab. 164; Bell v. Gough, 3 Zab 706; Cobb v. Davenport, 3 Vr. 380.
Note. — Mr. Justice Elmer did not hear any of the arguments of the cases upon the calendar of the New Jersey Supreme Court, at the February term, 1842, he being at Salem, holding the Circuit Court.