The Chancellor.
When this bill was filed, and an application made for an injunction, an order was made that a copy of the bill should be served on the defendants, and that they should show cause, on a day named, why an in-unction should not issue. The defendants availed them *221 selves of the opportunity, thus afforded them, of putting in their answer to the bill, and of being heard by counsel in opposition to the application.
The bill is purely an injunction bill, and asks that the defendants may be perpetually restrained from demolishing a dam, and water works connected with it, at the mouth of Little Timber creek, in the county of Camden.
Little Timber creek is a small creek emptying into the river Delaware, about five miles below the city of Camden. The tide, when not obstructed, ebbs and flows about two miles up the creek. Some time in, or previous to fhe year 1760, the owners of the meadow land adjacent to the creek, for the purpose of improving their meadows by the exclusion of the tide water, built a dam of about a quarter of a mile wide at the mouth of the creek, with sluices and other fixtures.
In November, 1760, the legislature of the then colony of New Jersey passed an act to enable the owners of meadows along the creek to support and maintain this dam and fixtures erected for the aforesaid purpose. The act, after reciting the erection of the dam and its purposes, enacted, that the said bank, dam, and all other water works already erected, or which should thereafter be found necessary to be erected for the more effectual preventing the tide from overflowing the meadows lying on the said creek, should be erected, supported, and maintained at the equal expense of all the owners and possessors of the meadows, that each of the said owners or possessors then, or thereafter, might hold on the said creek between certain points in the act designated. It further enacts, that the natural watercourse of the creek should be kept clear, and specified the manner in which it should be done. It then provides for the election, by all the land owners yearly, of two managers, and empowers these managers to assess the owners and possessors of the meadows in such sum or sums of money as shall bo by them, or the survivor of them, deemed necessary for the supporting, *222 repairing, and maintaining the hank, dam, and other water works. It confers upon these managers power to collect the assessments by suit at law; or if the owner of the meadow assessed is absent, and beyond the reach of legal process, it provides for the leasing of his land, for the purpose of paying such assessment. There are other provisions of the act to carry out its important object, viz. to make it compulsory on all meadow owners, whose lands are benefited and rendered more valuable by the dam and works, to contribute to repair and maintain them. This act was accepted by the owners of the meadow. Managers were elected under it, and under and by virtue of its provisions, the bank, dam, and water works have been repaired and maintained to this day. It is alleged that upwards of eight thousand dollar’s have been expended on the works; that the value of the meadows have thereby been greatly enhanced, and that the demolishing the dam would destroy the value of the meadows.
The legislature, at its last session, passed an act declar- ■ ing Little Timber creek to be a public highway, in all respects as fully as it was before the said creek was dammed at its mouth; and' the township committee is authorized and required, at the expense of the township, to remove the dam, and thereby open the navigation of the creek, on the first day of September next. It is to enjoin the township committee of the township of Union, • in the county of Camden, from discharging the duty imposed upon them by this act, that this bill is filed.
In the first place, it is insisted that the dam at the mouth of Little Timber creek destroys the navigation of a navigable stream where the tide ebbs and flows, and that the legislature have no right or power to authorize such an obstruction.
It appears, from the pleadings, that at certain states of the tide, this creek, if unobstructed, is navigable by small flat bottomed boats for at least two miles from its mouth. It does not appear that it ever has been used for the pur *223 poses of navigation. It has not been navigated since the year 1760. There is no allegation, on the part of the defendants, and nothing in the case to show that its navigation now is demanded by the public interest, or that, as a navigable stream, it would be any way beneficial to the public for the purposes of trade or agriculture. Admit, for the sake of the argument, that the state legislature has not the power permanently to obstruct or to destroy any navigable river within its territorial jurisdiction, it does not follow that any creek or rivulet, in which the tide ebbs and flows, and which may be used at certain tides by small boats for individual convenience, is to be dignified with the appellation of an arm of the sea or navigable river, and, as such, beyond the jurisdiction or control of the legislature, except as a public highway. Washed, as more than two-thirds of the borders of our state is, by the sea and by the rivers Hudson and Delaware, and their bays, the small creeks and rivers made by the force of the tides into the upland, in extent from a mile to six miles, are almost innumerable. At high tides, many of them may be navigated with small bottomed boats, and have been occasionally and with advantage, by individuals owning the adjacent meadows, for the transportation of grass, and, perhaps, other articles of merchandise. Many of them have been cut off from the sea, under fixe express sanction of the legislature, for the purpose of reclaiming and improving the adjacent meadow land and extending public roads, and the navigation of many more has been totally destroyed without any legal authority, and no complaint made by the public or by individuals on account of the manifest advantage resulting to the public from the obstruction. Most certainly a court of justice would not be justified in declaring that there is no authority in the state to determine when such streams shall be considered as navigable rivers, and be maintained and protected as such, or to determine when they may be obstructed, and their navigation destroyed, for the *224 public necessity or convenience. Tbe legislature must be tbe sole judge and arbiter for tbe public in tbis matter, and courts bave no right to question tbis authority. In tbe exercise of powers conferred by tbe constitution upon tbe general government, questions may arise between it and tbe state governments; but no individual can question tbe legislation of tbe state in reference to what is called common rights of navigation, unless be can summon to bis aid, in some way, tbe legislation of tbe general government, which is paramount authority. Tbe authorities will, I think, be found to sustain tbis doctrine. Some will be found to go much further, and to declare that tbe mere fact of tbe tide ebbing and flowing, and of tbe channel being such as to make tbe creek navigable at certain periods of tbe tide, does not entitle it to the protection of tbe court as a public navigable river. In tbe case of The King v. Montague and others, 4 B. & C. 596, 10 E. C. L. 413, it was decided that a public right of navigation in a river or creek may be extinguished, either by an act of parliament or writ of ad quod damnum, and inquisition thereon, or under certain circumstances, by commissioners of sewers, or by natural causes, such as tbe recess of tbe sea or an accumulation of mud, &c. And where a public road obstructing a channel (once navigable) has existed for so long á time that tbe state of tbe channel at tbe time when tbe road was made cannot be proved, in favor of tbe existing state of things, it must be presumed that tbe right of navigation was extinguished in one of tbe modes before mentioned, and tbe road cannot be removed as a nuisance to that navigation. In tbe case of The Mayor of Lynn v. Turner, Cowp. 86, which was a suit brought against tbe corporation of Lynn for not repairing and cleansing a certain creek into which tbe tide of tbe sea was accustomed to flow and reflow, Lord Mansfield, on tbe argument, asked counsel, “How does it appear that tbis is a navigable river ? Tbe flowing and reflowing of tbe tide does not make it so, for there are many places *225 into which the tide flows which are not navigable rivers, and. the place in question may be a creek in their own private estate.”
The flux and reflux of the tide is prima fade evidence of a navigable river, but it is not conclusive evidence. Miles v. Rose and anothor, 5 Taunt. 706. The strength of this prima fade evidence, says Bagley, J., in the case of Rex v. Montapue, arising from the flux and reflux of the tide, must depend upon the situation and nature of the channel. If it is a broad and deep channel, calculated for the purposes of commerce, it would be natural to conclude that it has been a public navigation; but if it is a petty stream, navigable only at certain periods of the tide, and then only for a very short time and by very small boats, it is diflieult to suppose that it ever has been a public navigable channel.
Commonwealth v. Breed, 4 Pick. 460. An information in the nature of a quo warranto was filed by the direction of the legislature, alleging that Breed, the respondent, had erected and still maintains a bridge across a navigable arm of the sea, between Chelsea and Belle Island, whereof the passing of vessels is obstructed, and reqiiiring him to answer by what authority he claims to keep up and maintain the bridge. The respondent set up a law of Massachusetts, passed in the year 1816, which authorized him to build a bridge convenient for the accommodation of the proprietors of Belle Island; that it should be built with a draw not less than fifteen feet wide; that the proprietor should, at all times when necessary, have the draw raised, at his own expense, for the convenient passing of vessels through the same.
The solicitor general replied, that the statute granted the respondent the privilege of erecting a bridge for the private accommodation of passing and repassing to( and from the island, the same being the private estate of the respondent, and that the grant was not for any public easement or convenience; that it was the intent of the *226 statute that the draw should he of sufficient width to permit the convenient passing of all such vessels as had been accustomed to navigate the inlet before the erection of the bridge, and with such necessary piers, &c. The respondent rejoined, that he had complied with the provisions of the statute, and thereupon issue was joined. The jury found that the water above the bridge was navigable for coasting vessels of one hundred tons burthen, and was used before the building of the bridge, and that the draw was not of sufficient width. The court said, the legislature are to determine when the public convenience and necessity require such an obstruction to navigation, and upon what terms and conditions it shall be allowed.
Rowe v. Granite Bridge Corporation, 21 Pick. 844. The ■company were authorized to construct a road from Milton to Dover, and to locate, build, and construct a bridge across Neponset river, in continuation of the line of the road. The plaintiff was the owner of a piece of salt meadow in Milton. He alleged, that from time immemorial, there had been a creek commencing at the highest part of the marsh, and passing through it to Neponset river, which creek was of sufficient depth and width to admit boats, gondolas, and light craft to pass up and down the creek in common tides, and that such craft might be used to advantage in removing the crops of hay from the marsh; that the defendants had laid out their road over the marsh '■and across the creek, and were proceeding to fill up the creek. An injunction was asked to restrain the defendants. The court decided, that a creek in a salt meadow, in order to be deemed navigable, must not be merely sufficient to float a small boat at high water, but must be navigable generally and commonly to some purpose useful to trade and agriculture. O. J. Shaw, in giving the opinion of the court, says, “ It is not every ditch in which the salt water ebbs and flows through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, which can be *227 considered a navigable stream. Nor is it every small creek in which a fishing skiff or a gunning canoe can be made to float at high water which is deemed navigable. But in order to have this character, it must be navigable to some purpose useful to trade and agriculture. It is not a mere possibility of being used under some circumstances, as at extraordinary high tides, which will give it the character of a navigable stream, but it must be generally and commonly useful to some purpose of trade or agriculture.”
In the case of Thompson, Wilson, & others, plaintiffs in error, v. The Blackbird Creek Marsh Company, defendants, 2 Peters 245. Blackbird creek, in the state of Delaware, was navigable for steamers of upwards of ninety tons bur-then. Under an act of the state of Delaware, the defendants constructed a dam across the creek, by which the navigation was obstructed. The court decided that the act of the legislature authorizing the dam was not in violation of the constitution of the United States.
There can, I think, be no doubt that the legislature had the power to authorize the erection of a dam at the mouth of Little Alloways creek. There is nothing in the case to show that it ever was a navigable stream, or that a boat of any size ever passed up it.
The defendants further insist, that the dam having been originally made and constructed without the authority of the state, the true construction of the act of 1760 is to give to the defendants not a grant of any right which belonged to the state, but a mere license to continue a nuisance already existing, and that this license was revocable at pleasure.
It may well be questioned, upon the case presented to the court, whether this dam was originally a nuisance, and whether it could not be maintained without legislative sanction. If it was not a navigable river, then it might be obstructed without the authority of the legislature; and although the fact of the ebb and flow of the tide is prima facie evidence of its being a navigable river, it may be *228 doubted whether the case presented does not overcome such evidence. At any rate, if the question for injunction turned upon that point, the court would not permit the defendants to be deprived of their property without affording them the opportunity of overcoming such evidence.
But while it is true that the dam was not originally erected under the act of 1760, the construction of this act contended for by the defendants cannot be admitted. The dam has been maintained under that act for nearly a century. The act did not authorize the owners of the meadows simply to continue the dam, but it gave the authority of the state to compel its continuance. It has not been continued by the voluntary act of individuals, but they have been compelled to maintain it by the power and force of law. This act created a quasi corporation, provided for the annual election of managers, conferred upon them power to assess property, and clothed them with authority to enforce these assessments. How then, with any propriety, can it be said, that this act was a license only to continue a nuisance already existing ? ’Whether this act can be repealed at pleasure, so as to deprive parties who have acquired rights under it, is the important question upon which this ease turns.
The act of the legislature, passed the 17th March, 1854, which authorizes and requires the township committee of the township of Union to remove the dam, is in violation of the constitution of the United States, which declares, that no state shall “pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts.” It is a virtual repeal of the act of 1760. The last named act was a grant. It granted valuable powers to the owners of meadows along Little Timber creek. In the Dartmouth College case, Justice Story remarks : “ A grant of franchise is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a pure donation, when the grant was complete, and *229 accepted by the grantors, it involved a contract that the grantees should hold, and the grantors should not reassume the grant, as much as if it had been founded on the most valuable consideration.” Under the provisions of the act of 1760, rights have become vested, and valuable property has been acquired. These powers and this property have been enjoyed under the protection of this act for nearly a century past. The state has participated in the benefits conferred. The property acquired under the act lias been taxed for the support of the state and municipal governments. It is in violation of good faith, it impairs the obligation of a contract which has been enjoyed' to the mutual benefit of both parties, and it is therefore repugnant to the constitution of the United States. It is in direct conflict with repeated judicial decisions declaring similar acts void. Fletcher v. Peck, 6 Cranch 87; State of New Jersey v. Wilson, 7 Cranch 164; Dartmouth College v. Woodward, 4 Wheat. 518; Trent and others v. Taylor and others, 9 Cranch 43; Story’s Com. on the Constitution of the U. States, 3 vol. 256.
The act of 1854 is also repugnant to the constitution of the state of New Jersey. Art. 1, § 16, declares private property shall not be taken for public use without just compensation. And Art. 4, § 7, part 9, individuals or private corporations shall not be authorized to take private property for public use, without just compensation first made to the owners. The dam and water works in question are private property. They have been constructed, maintained, and paid for by the owners of the meadow along the creek. They have been acquired under the express sanction of law. The value of the meadow is destroyed by the execution of the law in question, and thus may be said, with propriety, to be taken from the owners. A partial destruction, a diminution of their value, is the taking'of private property. This act cannot be carried into effect without a violation of the constitution of the state.
*230 But to avoid the force of these objections to the act, the defendants set up, in their answer, that this darn is a nuisance; that the conditions contained in the act, and upon which the rights and privileges of the act are secured to the defendants, have been violated, and that therefore the legislature have ordered, and have a right to authorize and direct the removal of the nuisance. But the defendants must justify themselves, and can only justify themselves under the act. The act declares the object to be to restore the navigation of the creek. The act can be executed for no other purpose.
But suppose the conditions of the act to have been violated, and that the grant has been forfeited, the forfeiture must be declared by due process of law. The legislature have no right to condemn the defendants unheard, and deprive them of their property in this summary way. If they can do it in this case, then they may repeal every act of incorporation on the statute book upon the same pretext.