44 N.J. Super. 591 (1957)
131 A.2d 415
ARTHUR SCHULTZ, PLAINTIFF-APPELLANT,
v.
ROBERT WILSON AND DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT, DIVISION OF PLANNING AND DEVELOPMENT OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1956.
Reargued February 4, 1957.
Decided April 26, 1957.
*592 Before Judges GOLDMANN, FREUND and CONFORD.
*593 Mr. Robert V. Carton argued the cause for appellant (Messrs. Durand, Ivins & Carton, attorneys).
Mr. David D. Furman, Deputy Attorney-General, argued the cause for respondent Division of Planning and Development, Department of Conservation and Economic Development (Mr. Grover C. Richman, Jr., Attorney-General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Arthur Schultz appeals from the granting of a riparian deed, over his objection, to respondent Robert Wilson by the State of New Jersey, acting through respondent Division of Planning and Development, Department of Conservation and Economic Development. R.R. 4:88-8.
On November 9, 1954 Wilson, as owner of property on West Front Street, Keyport, New Jersey, applied pursuant to R.S. 12:3-10 for a riparian grant of lands under tidewater on Luppatatong Creek adjoining and to the rear of his property. Schultz having filed an objection, the Navigation Committee of the Council of the Division of Planning and Development held a hearing. Schultz claimed that he had paramount title to the bed of the creek by reason of grants made to John Bowne, his predecessor in title and an early settler in the area, by certain chief sachems, on behalf of themselves and all other Indians concerned, in 1676 and 1679. Bowne's title was further secured by grants from the Board of Proprietors of East Jersey in 1676 and 1687.
Following the hearing the Commissioner of the Department of Conservation and Economic Development requested a legal opinion of the Attorney-General, who in due course advised that the Indian deeds had no validity, that title to lands under tidewater remained in the State of New Jersey as sovereign, unless granted in accordance with the law, and that the Council could disregard Schultz' objection and proceed with the merits of the application.
*594 The riparian grant was executed January 30, 1956 and recorded. By it the State conveyed to Wilson all of its right, title and interest "in and to the lands now or formerly flowed by tidewater at mean high tide of Luppatatong Creek or its tributaries," lying within the boundaries of a tract described by metes and bounds and measuring 123 feet in width and 38 feet in depth, facing on West Front Street. The part of the grant here under challenge is to the rear of Wilson's property and extends 10 to 12 feet outward from a former bulkhead line in the bed of the creek. The deed fixes an exterior pierhead and bulkhead line at the outer limit of the riparian grant. The grant was made subject to the usual limitation that if Wilson were not the owner of the adjoining upland, the conveyance was to be void. Further, the grantee was barred from filling in the lands under tidewater, erecting any pier or structure, or appropriating the lands to his own exclusive use, without a permit for that purpose issued by the Division of Planning and Development.

I.
On this appeal Schultz abandons his claim of paramount title deriving from Indian deeds. Such a contention could not have been supported. Whatever we may think at this late date of the moral quality of the principle, it has long been established that the Indians had only a possessory right to the lands they occupied. They were mere temporary occupants of the soil, and the absolute rights of property and dominion belonged to the European nation which first discovered the particular portion of this country where the Indian lands were located. The legal rights of the European discoverers were succeeded to by the states or by the general government. Martin v. Waddell's Lessee, 16 Pet. 367, 409, 41 U.S. 367, 409, 10 L.Ed. 997 (1842) (Taney, C.J.), also reported in 18 N.J.L. 495; 42 C.J.S. Indians § 28, p. 688 (1944). Interesting in this connection is the act of December 13, 1703 "regulating the Purchasing of Land from the Indians," which provided that no person could *595 buy lands from the Indians unless he had a right of propriety and obtained a license. Allinson, Acts of the General Assembly of the Province of New Jersey ____ 1702-1776, p. 1 (1776); and see Fisher, New Jersey as a Royal Province, pp. 185-186 (1911).
The grants by the Board of Proprietors of East Jersey were also without legal efficacy. The proprietors never had, either before or after their surrender of the powers of government to Queen Anne in 1702, any right or interest in, or power over the soil covered by tidewaters within the limits of this State. This was settled in the early cases of Arnold v. Mundy, 6 N.J.L. 1 (Sup. Ct. 1821); Martin v. Waddell's Lessee, above; Bell v. Gough, 23 N.J.L. 624 (E. & A. 1852), and Stevens v. Paterson & Newark R. Co., 34 N.J.L. 532 (E. & A. 1870) (Beasley, C.J.).

II.
Luppatatong Creek flows into Raritan Bay not far from the premises in question, and concededly is subject to tidal ebb and flow. Schultz now argues that the State had no title to the bed of the creek which it could convey. He claims that the test, as determined by our decisions, is that before there can be a riparian grant by the State of land under tidewater, the waters must not only be tidal, but navigable as well. Appellant did not argue or present evidence on the issue of navigability at the hearing before the Navigation Committee. We do not stay to consider whether the creek is in fact navigable  it is about 4 1/2 feet deep at high water and 1 1/2 feet at low tide and apparently adequate for navigation by the type of flat-bottom boat commonly used on the tidal bays and streams of New Jersey  for we consider the test which appellant would have us adopt as contrary to the applicable law of this State.
No purpose would be served by referring to the generalized expositions of textwriters and digests, unless it were by way of passing reference. (Among the authorities are the *596 English texts, Coulson and Forbes, Waters and Land Drainage (6th ed. 1952), and Moore, History and Law of the Foreshore (3d ed. 1888); the American works, Farnham, Waters and Water Rights (1904), and Gould, Law of Waters (3d ed. 1900); and see Boyer, Waterways of New Jersey (1915), for a history of riparian ownership and control in New Jersey.) Our problem must be resolved in the light of the principles which emerge from the considerable collection of New Jersey cases dealing with lands under water within the boundaries of the State, and the private and public rights therein. The decisions begin with Arnold v. Mundy, above, in 1821, and proceed down to the very recent opinion of our Supreme Court in Bailey v. Council of the Division of Planning and Development, 22 N.J. 366, decided in 1956.
Appellant relies chiefly on Glover v. Powell, 10 N.J. Eq. 211 (Ch. 1854), of which more anon; on distinguishable language in several other New Jersey cases, and on general statements by textwriters and law cyclopedias that are without pertinence.
Historically, the title of the State, as sovereign, to submerged lands under tidewaters has long been beyond dispute. There is no need here to trace in detail the by now familiar sequence of the letters patent of Charles II in 1664, granting his brother James, Duke of York, a large tract of land in North America, including what is now New Jersey; the latter's lease and release of the Province of Nova Caesarea (New Jersey) to Berkeley and Carteret; the Quintipartite Deed of 1676 which divided the province into East and West Jersey; the subsequent instruments investing the proprietors with the rights of property and government originally conferred on the Duke of York; their surrender of the powers of government to Queen Anne in 1702, and all the steps intermediate to these. See Leaming and Spicer, Grants, Concessions and Original Constitutions of the Province of New Jersey (1758), and Smith, History of the Colony of Nova-Caesaria, or New Jersey (2d ed. 1877), passim. Nor need we presently review the meaning and *597 legal effect of these instruments and historical events in relation to the problem we deal with. The history of ownership of riparian lands in this State from the time of the English Crown has already been traced, and at some length, in a number of leading cases: Arnold v. Mundy, 6 N.J.L. 1 (Sup. Ct. 1821); Martin v. Waddell's Lessee, 16 Pet. 367, 41 U.S. 367, 10 L.Ed. 997 (1842); Gough v. Bell, 21 N.J.L. 156 (Sup. Ct. 1847), 22 N.J.L. 441 (Sup. Ct. 1850), affirmed sub. nom. Bell v. Gough, 23 N.J.L. 624 (E. & A. 1852); Stevens v. Paterson & Newark R. Co., 34 N.J.L. 532 (E. & A. 1870); Attorney-General v. Delaware and Bound Brook R.R. Co., 27 N.J. Eq. 1 (Ch. 1876), affirmed 27 N.J. Eq. 631 (E. & A. 1876); and Ross v. Mayor & Council of Borough of Edgewater, 115 N.J.L. 477 (Sup. Ct. 1935), affirmed 116 N.J.L. 447 (E. & A. 1936), certiorari denied 299 U.S. 543, 57 S.Ct. 37, 81 L.Ed. 400 (1936).
There can be no question of the right of the Legislature, or the Council of the Division of Planning and Development, acting under a delegation of legislative powers, to convey the lands under tidal waters of Luppatatong Creek to Wilson. The Legislature has the power, absolute and unlimited, to regulate, abridge or vacate public rights in tidal waters except in the field reserved to Congress by the Federal Constitution. Stevens v. Paterson & Newark R. Co., above, 34 N.J.L., at pages 549, 550, 552; City of Hoboken v. Pennsylvania R. Co., 124 U.S. 656, 688, 690, 8 S.Ct. 643, 31 L.Ed. 543 (1888); Ross v. Mayor and Council of Borough of Edgewater, above, 115 N.J.L., at page 484; Bailey v. Driscoll, 19 N.J. 363, 367 (1955), reversing in part 34 N.J. Super. 228 (App. Div. 1955).
We are not here dealing with the public right of fishery, as in Arnold v. Mundy and Martin v. Waddell's Lessee, above; or the common right of navigation, considered in such cases as Attorney-General ex rel. Pattee v. Stevens, 1 N.J. Eq. 369 (Ch. 1831), and Glover v. Powell, 10 N.J. Eq. 211 (Ch. 1854); or the right to wharf out and fill in to low-water mark, as in Bell v. Gough, above. Appellant's *598 references to decisions dealing with these and similar subjects are not apposite. The question before us for decision is, simply: Who has title to the lands under tidal creeks in this State?
Under the common law of England, the title to the bed of the sea below the high-water mark and to the bed of all streams as far as the flow of the tide extended, was in the Crown. The United States Supreme Court stated the English rule on the sovereign ownership of submerged lands in Shively v. Bowlby, 152 U.S. 1, 11, 14 S.Ct. 548, 551, 38 L.Ed. 331 (1894):
"By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below highwater mark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation, and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the King's subjects. Therefore the title, jus privatum, in such lands, as of waste and unoccupied lands, belongs to the King, as the sovereign; and the dominion thereof, jus publicum, is vested in him, as the representative of the nation and for the public benefit." (152 U.S., at page 11, 14 S.Ct., at page 551)
And see 56 Am. Jur., Waters, § 452, p. 864, and note 6 (1947).
It was said by Lord Hale, whose De Jure Maris (reprinted in Moore, History and Law of the Foreshore (3d ed. 1888)), was considered "a book of so high authority, that from it there seems to be no appeal, either by sovereign or subject, upon any question relating to their respective rights, either in the sea, arms of the sea, or private streams of water" (see Cobb v. Davenport, 32 N.J.L. 369, 379 (Sup. Ct. 1867), and Attorney-General v. Delaware & Bound Brook R.R. Co., above, 27 N.J. Eq., at page 638):
"The shore is that ground that is between the ordinary high-water and low-water mark. This doth prima facie and of common right belong to the king, both in the shore of the sea and the shore of the arms of the sea.

* * * * * * * *
*599 * * * that is called an arm of the sea where the sea flows and reflows, and so far only as the sea so flows and reflows; so that the river of Thames above Kingston and the river of Severn above Tewkesbury, etc. though there they are publick rivers, yet are not arms of the sea. But it seems, that, although the water be fresh at high water, yet the denomination of an arm of the sea continues, if it flow and reflow as in Thames above the bridge." (Moore, History of the Foreshore, at page 378)
After the Revolution the several states succeeded to all the rights and powers of the English Crown and Parliament in the soil under tidewaters. Title and control of all lands below high water in tidal streams within New Jersey became vested in the State as sovereign, and are held under the guardianship of the Legislature. Ross v. Mayor & Council of Borough of Edgewater, above, 115 N.J.L., at page 483, quoted favorably in Bailey v. Driscoll, above, 19 N.J., at page 367. The Bailey case upheld a grant of filled-in lands, formerly under tidewater of Muscrat Creek, an arm of Barnegat Bay, Ocean County. There was no proof of the depth of Muscrat Creek over the lands in question, or that the creek was navigable at any time. Bailey in part affirmed and in part reversed the judgment of the Appellate Division, but did not question its statement that the tidal test, as opposed to the navigability test, is applied in this State to determine the sovereign title to submerged lands. The Appellate Division had said:
"Equally well settled since the landmark opinion of Chief Justice Beasley in Stevens v. Paterson & Newark R.R. Co., 34 N.J.L. 532 (E. & A. 1870), is that, by the common law, the ownership of all lands under tidewater below high water mark within the territorial limits of the State belonged to the Crown of England, did not pass to the proprietors of New Jersey under the grant from the Duke of York, and became vested by the Revolution in the sovereignty of the State under the guardianship of the Legislature. Ross v. Mayor & Council of Borough of Edgewater, supra. New Jersey applies the tidal test  the law of England  as distinct from that of navigability, which is the criterion of federal power also used in many other states, to determine in what waters and lands thereunder the property is in the sovereign. Cobb v. Davenport, 32 N.J.L. 369, 378 (Sup. Ct. 1867). This is in line with the established principles that each state is at liberty, subject to the paramount power of the Federal Government to control navigation *600 to the extent necessary for the regulation of commerce and constitutional limitations upon interference with vested rights, to determine over what submerged lands its sovereign prerogative of ownership shall be exercised (56 Am. Jur. § 461) and that each state may similarly deal with such lands `according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public * * *.' 56 Am. Jur. § 471, p. 884." (34 N.J. Super. 228, at page 247)
Cobb v. Davenport, 32 N.J.L. 369 (Sup. Ct. 1867), cited by the Appellate Division in Bailey v. Driscoll, dealt with the question of ownership of Green's Pond, a large fresh water lake. The language of Justice (later Chief Justice) Depue, with whom Chief Justice Beasley and Justice Bedle concurred, merits quotation at some length since it deals directly with the subject at hand:
"* * * by the common law, all waters are divided into public waters and private waters. In the former the proprietorship is in the sovereign; in the latter in the individual proprietor. The title of the sovereign being in trust for the benefit of the public  the use, which includes the right of fishing and of navigation, is common. The title of the individual being personal in him, is exclusive  subject only to a servitude to the public for purposes of navigation, if the waters are navigable in fact.
The test by which to determine whether waters are public or private, is the ebb and flow of the tide. Waters in which the tide ebbs and flows  so far only as the sea flows and re-flows, are public waters, and those in which there is no ebb and flow of the tide, are private waters. (Italics ours.)
These principles of the common law are so well settled, that a citation of authorities on the subject is quite unnecessary. * * *
The tidal test, as distinguishing waters in which the property is in the sovereign, from those in which it is in private individuals, was said on the argument to be founded in no principle. Many of the rules of the common law, by which rights are ascertained and property is acquired, held, and transmitted, if subjected to such criticism would be found to be equally devoid of principle. As a rule by which individuals may be guided in ascertaining what rights belong to them, as a portion of the public, and what are exclusively within the domain of private ownership, it has the merit of uniformity and certainty, and is easy of application. The criterion suggested on the argument, of holding all rivers which are navigable in fact to be public rivers, and those which are not navigable in fact to be private rivers, is wanting in that accuracy and certainty at which the law aims. It can only be made certain by the addition *601 of some arbitrary rule, such as depth of water, quantity of tonnage, or the like, and even then is still open to the objection that no man can tell whether he is exercising a public right, or trespassing upon a private right, without entering upon an investigation, and thus the way is opened for discussion and disturbances.

* * * * * * * *
In this state there is nothing in topography or location that requires a departure from the rules of the common law. * * * Our system of land titles, and the decisions of our courts, have been in conformity with the common law on this subject, * * *.
In these cases [Arnold v. Mundy, Bell v. Gough, Martin v. Waddell's Lessee] the tidal test, as distinguishing the jus publicum from the jus privatum, is recognized, and is assumed to be in force in this state. * * *" (32 N.J.L., at pages 378-380)
This language, as far as our extensive review of the cases reveals, has never been criticized in the 90 years it has been in the reports. The tidal test established by Cobb was favorably referred to by the Court of Errors and Appeals in Attorney-General v. Delaware & Bound Brook R.R. Co., above, 27 N.J. Eq., at page 639. That court again referred to the case in McCarter v. Hudson County Water Co., 70 N.J. Eq. 695 (E. & A. 1906), where Justice Pitney said (at page 710) that "the case properly applied the tidal test as distinguishing public from private waters."
In this connection, it is appropriate to note our decision in Leonard v. State Highway Department, 29 N.J. Super. 188 (App. Div. 1954), affirming 24 N.J. Super. 376 (Ch. Div. 1953), where we held that the State had exclusive title to meadowlands which at one time had been diked by the owner, but had since been reflowed by tidewater. Although navigability was not brought into issue, the court was obviously dealing with lands non-navigable at low water.
The subject of banked meadowlands was also treated in Simpson v. Moorehead, 65 N.J. Eq. 623 (Ch. 1904), although in a different aspect. The court there said:
"Some of the principles laid down by defendant's counsel regarding such lands are indisputable. One of them is that the State of New Jersey was, in its right as sovereign, the owner of all that belt of land lying at high-water mark within the tidal waters of the state, and thence out into the sea or river, so far as there can be any ownership of lands. That, in substance, is the holding in *602 the leading cases of Arnold v. Mundy, 1 Halst. 1 [6 N.J.L. 1], and Martin v. Waddell ['s Lessee], 3 Harr. 495 [18 N.J.L. 495]." (65 N.J. Eq., at page 628)
Glover v. Powell, above, 10 N.J. Eq. 211 (Ch. 1854), heavily relied on by the appellant, is inapplicable. That case concerned itself solely with the question of the public right of navigation in Little Timber Creek, and nothing more. Appellant also seeks support for his argument that the State can have no title to the bed of a stream unless the stream be both navigable and tidal, by referring to a number of cases where the court speaks of the State's right in "navigable streams" or "navigable tidewaters." An examination of those cases (and others not cited to us) reveals that the word "navigable" was either used in connection with a body of water concededly navigable, or employed gratuitously as an additional word of description. A few examples will suffice. Arnold v. Mundy, above, 6 N.J.L. 1, involved the common right of fishery in the Raritan River, as did Martin v. Waddell's Lessee, above, 16 Pet. 367, 41 U.S. 367, 10 L.Ed. 997. Attorney-General ex rel. Pattee v. Stevens, above, 1 N.J. Eq. 369 (Ch. 1831), dealt with the public right of navigation in the South River, and Bell v. Gough, above, 23 N.J.L. 624, concerned the right to wharf out on the Hudson River. Stevens v. Paterson & Newark R. Co., above, 34 N.J.L. 532, and Hoboken v. Pennsylvania R. Co., 124 U.S. 656, 8 S.Ct. 643, 31 L.Ed. 543 (1888), dealt with structures in the beds of the Passaic and Hudson Rivers, respectively. And Marcus Sayre Co. v. City of Newark, 60 N.J. Eq. 361 (E. & A. 1900), concerned the municipality's right to use the Passaic River for emptying sewage. Most of the tidal rivers of New Jersey are also navigable and, with the exception of the Delaware River above Trenton, the navigable rivers are generally tidal. This concurrence of tidal ebb and flow with navigability may have led to some of the language utilized by the courts as dicta in cases relied upon by appellant.
The statute law providing for the acquisition of submerged lands from the State clearly fixes the tidal test of *603 state ownership. In section after section of Chapter 3 of Title 12 of the Revised Statutes, dealing with riparian lands, the Legislature has referred to land under tidewater. See, for example, R.S. 12:3-3, 4, 5, 10, 12, 16, 17, 18, 19, 21, 22, 26, 28, 32, 35, 41, 42, 45, 66, 68, 69, and N.J.S.A. 13:1A-32.1. R.S. 12:3-10, under which the grant was made to respondent Wilson, reads in part:
"Any riparian owner on tidewaters in this State who is desirous to obtain a lease, grant or conveyance from the State of New Jersey of any lands under water in front of his lands, may apply to the board, which may make such lease, grant or conveyance with due regard to the interests of navigation, upon such compensation therefor, to be paid to the State of New Jersey, as shall be determined by the board, which lease, conveyance or grant shall be executed as directed in sections 12:3-2 to 12:3-9 of this Title, and shall vest all the rights of the State in said lands in said lessee or grantee." (L. 1871, c. 256, § 1, supp. to L. 1864, c. 391; as amended L. 1938, c. 418)
Thus, only riparian owners "on tidewaters" are eligible to apply for riparian rights under R.S. 12:3-10. That the grant must be made "with due regard to the interests of navigation" does not show a legislative intention that the waters included within the grant are necessarily navigable. The contrary is, in fact, true. The Supreme Court in Bailey v. Driscoll, above, recognized that the primary objective of riparian grants is to furnish access to a riparian owner from non-navigable water to a navigable channel or waterway. 19 N.J., at page 373; and Bailey v. Council of the Division of Planning and Development, 22 N.J., at page 370. And see Keyport & M.P. Steamboat Co. v. Farmers' Transportation Co., 18 N.J. Eq. 511, 516 (E. & A. 1866).
Other statutes authorize riparian grants in areas no longer flowed by tidewaters, R.S. 12:3-12, or by tidewaters probably only at high tide, N.J.S.A. 13:1A-32.1 (L. 1946, c. 299).
We determine, then, that the test to be followed in determining State sovereignty over submerged lands in New Jersey is the tidal test. Even if it be assumed that the question were still open, this court would reject the navigability *604 phase of the double test (tidal flow and navigability) urged upon us by appellant, as unworkable and not suited to this State. The tidal test assures certainty; the navigability test, as was said in Cobb v. Davenport, above, 32 N.J.L., at page 379, "is wanting in that accuracy and certainty at which the law aims." The navigability test could only be made certain by the adoption of arbitrary standards, such as depth of water, tonnage and the like, which would probably vary from stream to stream. It would raise the practical question of determining whether a particular stream like Luppatatong Creek was at one time navigable, since the State's right attaches then.
To adopt the navigability test would lead to chaotic and discriminatory consequences. For example, one riparian owner might have to acquire a riparian grant from the State in order to protect his pier, although his neighbor a short distance up-stream was exempt from such requirement because the mean depth off-shore from his upland was somewhat shallower. It has been pointed out that the navigability test is particularly unsuited to the ocean beach. Acceptance of the test could only lead to serious uncertainty in view of the established law of the State that filled-in lands formerly flowed by tidewater are State-owned. See R.S. 12:3-12; Bailey v. Driscoll, above.
It should be observed that the State has for many years, through the Council of the Division of Planning and Development and its predecessor boards and commissions, made riparian grants of lands under tidewaters, without regard to the question of navigability or non-navigability. To overthrow the tidal test would be to impair titles and jeopardize undertakings made on the faith of such grants.
It is also not inappropriate to note that the proceeds of riparian grants and leases vest in trust for the State School Fund. R.S. 18:10-5 and 6. Although, as was said in Bailey v. Council of the Division of Planning and Development, above, 22 N.J., at page 373, enrichment of the School Fund is not the ultimate consideration  and we have not viewed it as such  we are not unaware of the fact that *605 about 96% of the $16,000,000 principal of that fund was derived from the sale or lease of riparian lands by the State. We are informed that the estimated income from such sales or leases for the fiscal year 1955-1956 was $290,000. Any holding by this court which would limit the lands available for riparian grants or leases to navigable waters or, as appellant insists, to tidal and navigable waters, would seriously diminish the value of the property held in trust by the State for the School Fund.

III.
Appellant argues that the State never asserted title or made a riparian grant off-shore from respondent Wilson's property on Luppatatong Creek until the grant here under attack. It has been common knowledge for generations that many lands under tidewaters have not been subjected to specific state dominion until the execution of a riparian grant; the sovereign remained quiescent until some interested party made written application for such a grant. The State, of course, is not subject to the doctrines of estoppel and laches to the same extent that these are applied against private parties. Ordinarily, sovereign rights are not lost solely because of the delay or inaction of those entrusted with their enforcement. We discern no prejudice visited upon appellant by reason of the State's alleged inaction in enforcing its rights in Luppatatong Creek. Abbott v. Beth Israel Cemetery Ass'n., 13 N.J. 528, 548 (1953); Trustees for the Support of Public Schools v. Ott & Brewer Co., 135 N.J. Eq. 174, 177 (Ch. 1944); Caparell v. Goodbody, 132 N.J. Eq. 559, 571 (Ch. 1942); Attorney-General v. Central R. Co., 68 N.J. Eq. 198, 226 (Ch. 1904), affirmed 70 N.J. Eq. 797 (E. & A. 1906).

IV.
Appellant contends that the riparian grant to respondent Wilson is invalid because the Division of Planning and Development had not previously fixed and determined *606 an exterior pierhead and bulkhead line, claiming this was the holding in Bailey v. Driscoll, above, 19 N.J. 363 (1955). It appears that although a pierhead and bulkhead line had not theretofore been established with respect to the entire length of Luppatatong Creek flowed by the tide, the riparian deed to Wilson expressly fixes that line at a distance of 38 feet from West Front Street, at the outward limit of the tract granted. This line is shown on the map accompanying the grant. It was fixed in accordance with express statutory authority, R.S. 12:3-17, and the established practice of the Council of the Division of Planning and Development in fixing exterior lines in riparian deeds and the accompanying maps. Administrative construction is entitled to great weight in determining the powers of the administrative body pursuant to a regulatory statute. State Department of Civil Service v. Clark, 15 N.J. 334, 340 (1954); Swede v. City of Clifton, 39 N.J. Super. 366, 377 (App. Div. 1956), affirmed 22 N.J. 303 (1956).
We do not read Bailey v. Driscoll as requiring that the pierhead and bulkhead line must have been established prior to the making of a particular grant. The Supreme Court in that case reversed the Appellate Division, 34 N.J. Super. 228 (1955), which had invalidated a riparian grant insofar as it extended past the center line or thread of Muscrat Creek, formerly a tidal channel. The Council of the Division of Planning and Development had failed to establish an exterior pierhead and bulkhead line in the riparian deed, as it did in the instant case. The Supreme Court remanded the cause with directions to enter judgment upholding the validity of the riparian grant "to the extent it is not transgressed by the exterior lines to be established by the Council." The plain implication of this direction is that the exterior line may be established concomitantly with or even subsequent to the making of the grant.
After the coming down of the mandate in the Bailey case the Council proceeded to establish a pierhead and bulkhead line for the riparian grant there involved. When the case again came before the Supreme Court in Bailey v. Council *607 of the Division of Planning and Development, above, 22 N.J. 366, the court said (at page 372) that "normally" the line "would be established prior to a riparian grant." This indicates that the court was aware that such was not always the practice, and that the line might be fixed in the grant itself.
We do not consider the Bailey case as requiring the Council to make an independent survey to establish the pierhead and bulkhead line prior to the execution of a riparian grant. No reason appears why the line cannot be established in the grant itself. It would be unreasonable to assume that in fixing Wilson's exterior line the Council did not have in mind that in future grants the same exterior course would be followed along the creek, so as to establish a practical uniformity and assure littoral owners reasonable access to navigable waters. In our view, what the Council did here was in keeping with the statute and its established administrative procedures.
Affirmed.